## STATE OF NORTH DAKOTA EX REL. M. C. GAULKE v. A. F. TURNER.

(164 N. W. 924.)

Public grain-storage warehouses — building of — within state — Commissioners of Railroads — may create fund for — legislature — act — title — subject expressed in — must be but one — constitutionality.

1. The clause of senate bill No. 314, legislative assembly of 1917 [Laws 1917, chap. 56], which provides that the Commissioners of Railroads shall set aside 25 per cent of all fees collected to create a fund for building public grain-storage warehouses within the state, is not expressed in the title to the act, and is therefore unconstitutional.

Legislature — act of — Constitution — in violation of — subject of — must be embraced within title — constitutionality — upheld so far as expressed.

2. An act of the legislature which violates the provisions of § 61 of the Constitution of North Dakota, which provides that no bill shall embrace more than one subject which shall be expressed in its title, is invalidated only as to so much thereof as is not so expressed.

Habeas corpus proceeding — constitutionality of act — may be raised in.

3. The constitutionality of an act of the legislature may be raised in a habeas corpus proceeding.

NOTE.—The note in 18 L.R.A.(N.S.) 713, on power of legislature to delegate to commission the right to fix rates to be charged by public service corporation, referred to in the opinion above, is brought down in 32 L.R.A.(N.S.) 649.

**Subject of act — single — expressed in title — plurality of subjects — will not invalidate — as to part singly expressed.**

4. Where the subject of an act is single and the same is expressed in its title, the act will not be invalidated by the fact that the title announces a plurality of subjects.

**Act — title of — one subject — valid.**

5. The title of the act under consideration examined, and *held* not to contain more than one subject.

**Constitutional provision — act of legislature — title to embrace but one subject — must be therein expressed.**

6. The constitutional provision which provides that "no bill shall embrace more than one subject, which shall be expressed in its title," is not intended to forbid or to prevent including in the bill such means as are reasonably adapted to secure the objects indicated by the title.

**Title to act — provisions in body of — germane thereto — determination of — general subject — must be considered — express words — implication — meaning of terms — body of act — purpose of.**

7. In considering the title to an act, and determining whether the provisions in the body are germane thereto, the general subject must be considered and the specific wording of the title is not always important. It is sufficient if the title, either by express words or by necessary or reasonable implication from the meaning of its terms, includes the subject and the purposes of the body of the act.

**General purpose of act — expressed in title — agricultural products — marketing of — grains — inspection — grading — licenses — officers — compensation — germane to title and general purpose.**

8. Under a title which expresses the general purpose and subject of the regulation of the marketing of the agricultural products of a state, it is perfectly proper and germane for the body of the act to contain provisions for inspecting and grading the creation of markets, the granting of licenses and the fees and charges for such licenses and inspection and grading, as well as for the officers and deputies to be appointed and the compensation of such

**Ministerial officers — powers of — legislature may delegate — grades of grain — enforcement of act.**

9. The legislature may delegate to ministerial officers the power to create and to enforce grades.

**Ministerial board — powers of — employees — number of — compensation — general inspection law — terms of — necessary to carry out — cost of inspection — must not be exceeded — fees and licenses — fund — expenses paid from.**

10. The legislature may delegate to a ministerial board the power to fix

. the salaries, and to determine the number of employees necessary to carry out and enforce the provisions of a general inspection law, provided that the total sum to be paid and expended shall not exceed the reasonable cost of such inspection, and is paid from a fund created by fees for licenses and for inspection and grading, and no part of which is to be used for any other purpose.

**License fees — expenses of regulation — must not exceed.**

11. License fees cannot be exacted which are in excess of the sum reasonably necessary for the expenses of regulation.

**Economic facts — conclusions of legislature — conditions to be remedied — courts may review.**

12. The courts cannot review the economic facts on which the legislature of a state bases its conclusions that an evil exists and should be remedied.

**Legislature — discretion — public welfare — means employed to promote — propriety of its action — as to measure of means provided — courts cannot decide.**

13. The legislature of a state is given a large discretion with reference to the means it may employ to promote the public welfare, and the courts cannot undertake to decide whether the means adopted are the only or even the best means possible to attain the end sought.

**Ministerial boards — officers — power to perfect details — may be given — legislature — general outlines — laid down by.**

14. Ministerial boards and officers may be given the power to perfect the details of a plan, the general outlines of which have been laid down by the legislature.

**Marketing of agricultural products — regulations of — legislature may provide — public money — expenditure of — in aid of private persons — act does not require.**

15. Senate bill No. 314 of the legislative assembly of 1917, and which seeks to regulate the marketing of agricultural products in North Dakota, is not invalid or repugnant to the provisions of § 185 of article 12 of the Constitution, which forbids the loaning or giving of public moneys in aid of any individual, association or corporation.

**Constitutions — state — national — legislature — sovereign power of — limited only by Constitutions.**

16. Except where limitations are imposed by the state or national Constitutions, the sovereign power of the legislature is practically unlimited.

**Appropriations — general — special — later made by separate bills — embracing but one subject — system of regulation — provisions — carrying out of — act may provide.**

17. All that § 62 of the Constitution of North Dakota requires in regard to special, as opposed to general, appropriations, is that they "shall be made by

separate bills embracing but one subject;" and an appropriation may be made in an act creating a system of regulation, and for carrying out its provisions, and as a part of such act.

**Habeas corpus — writ of — liberty of person arrested — only affected by — other persons — intervention by — not permissible.**

18. A writ of habeas corpus affects only the liberty of the person arrested, and intervention on the part of other persons is not permissible.

**Legislature — directions of — carrying out — persons appointed for that purpose — bias or prejudice — not for courts to determine.**

19. Whether the persons directed by the legislature to carry out the provisions of an inspection or grading act are liable to bias or prejudice is a matter for the legislature, and not for the courts, to determine.

Opinion filed August 20, 1917.

Proceeding on a writ of habeas corpus.

Writ quashed.

*O'Connor & Johnson*, for petitioner, with brief by *E. T. Burke*, as *amicus curiæ*.

*William Langer*, Attorney General, *H. A. Bronson*, and *D. V. Brennan*, Assistant Attorneys General, and *T. B. Elton*, States Attorney (with *S. L. Nuchols*, of counsel) for respondent.

BRUCE, Ch. J. This is a proceeding on a writ of habeas corpus. In it is involved the determination of various constitutional questions arising out of an act passed by the legislative assembly of 1917, numbered senate bill No. 314, to be found on page 188 of the popular edition of the Session Laws, and generally known as the Uniform State Grading Act [Laws 1917, chap. 56]. An attack, indeed, is made upon the constitutionality of the whole law.

Although the question has been somewhat mooted, and although a proceeding in equity is much preferable, as in it various parties may be allowed to intervene and the act may thus be more thoroughly scrutinized, and from all standpoints, it seems now to be well established that the constitutionality of an act may be passed upon on habeas corpus. See 12 R. C. L. 1198; State ex rel. Goodsill v. Woodmansee, 1 N. D. 246, 11 L.R.A. 420, 46 N. W. 970.

The petitioner, M. C. Gaulke, is an operator of a public elevator and

warehouse at Thompson, North Dakota. More specifically, he is the agent and buyer of a co-operative farmers' elevator. He was arrested under the provisions of the act under consideration for the offense of having "purchased, weighed, graded, and inspected grain and seeds without first having obtained a license as deputy inspector of such grain and seeds thus purchased, graded, weighed, and inspected, said grain and seed not having first been inspected, weighed, and graded by a deputy state inspector of grades, weights, and measures."

The provisions of the act in question, and under which the arrest was made, are that "it shall be unlawful for any person operating a public warehouse to purchase, weigh, grade or inspect grain or seed who is not licensed as deputy inspector, provided that any person without a license may buy any article that has been graded, weighed and inspected by a deputy state inspector of grades, weights and measures."

The act as a whole is as follows:

"The Commissioners of Railroads, of North Dakota, shall appoint a member of the faculty of the North Dakota Agricultural College (who shall be an expert in the grading and weighing of all kinds of grain, seeds, and other agricultural products) to be the state inspector of grades, weights and measures and shall receive in addition to his other compensation the sum of $1,000 per annum. It shall be the duty of said inspector to proceed at once to define and establish proper grades and weights for grain, seeds and other agricultural products, also for flour meal and products made therefrom, which grades and weights shall be approved by the Commissioners of Railroads.

"The Commissioners of Railroads shall authorize the employment of such clerical help as is necessary for carrying out the provisions of this act, and determine the compensation to be paid for such service.

"The state inspector of grades, weights and measures shall cause said formula or scale of grades, weights and measures to be published in not more than five newspapers of general circulation in the state of North Dakota, two of which shall be devoted to the benefits of agriculture and three shall be papers of general circulation.

"The said standards of grades shall be published each year not later than August 1st.

"The state inspector of grades, weights and measures shall have power to appoint skilled and competent deputies who shall be stationed

at any town or place where grain, seed and other agricultural products are marketed; provided that the town or community where such deputy is stationed shall at their own expense provide a suitable building and scales for housing said deputy, the upkeep of said building and scales shall be borne by the state out of funds secured on account of fees collected for inspecting and weighing.

"It shall be the duty of the deputy to weigh, inspect and grade all grain, seeds and produce that shall be offered for sale at said market place, and to issue a signed certificate stating the kind, grade and weight of such grain, seeds or produce, also the amount of dockage, if any, and such other facts as he may find relative to its condition. It shall also be the duty of said deputy to accurately sample and grade carload shipments destined for some central market either within or outside the state, and to make and attach a signed inspection certificate to a sealed package containing the sample, and forward same to a deputy in charge of said central market.

"The Railroad Commissioners shall appoint such number of inspectors of public warehouses as may be necessary who shall be men of expert and practical knowledge of the grain business; who shall visit the public warehouses in the state for the purpose of ascertaining whether a sufficient bond is in force to protect the holders of storage tickets for grain stored therein; whether such institution is amply protected by insurance; to advise with local managers and board of directors as to proper methods of accounting; to assist local warehousemen in making proper reports, and to enforce the rendering of annual or other reports required by the Railroad Commissioners; to see that all laws as regards public warehouses are complied with, and to advise and assist local warehousemen in any way that will make for efficiency and for the safety of the grain marketing business of the state. Should such inspectors find any condition prevailing in any public warehouse that would impair the safety of such institution, they shall report same to the Board of Railroad Commissioners and to the local board of directors of the institution in question. Failure to remedy such condition will empower the Board of Railroad Commissioners to suspend the license of such warehouse, or in extreme cases, if after full notice, and reasonable time being allowed to comply with the instructions of the Board of Railroad Commissioners such local

warehouse refuses to remedy said complaint; the Board of Railroad Commissioners may cancel the license of such warehouse.

"The Commissioners of Railroads may establish as they see fit central markets for the display of samples of grain, seeds and other agricultural products, and may install a deputy in charge of said central markets at the cities of Duluth, St. Paul and Minneapolis, in the state of Minnesota, also Superior, Wisconsin, Fargo, Fairmont, Wahpeton, and Grand Forks, North Dakota, and such other stations as in the judgment of the Commissioners of Railroads shall be necessary to provide adequate marketing facilities; that said markets shall be open to any and all persons desiring to buy or sell on said market, and that the charges for said services shall be fixed and determined by said Commissioners of Railroads. They shall also establish uniform fees for grading, weighing, inspecting and selling. All of said fees so collected shall be paid into the treasury of the state of North Dakota. They shall also fix the salary or compensation to be paid to deputies and employees. They shall also provide a system of bonding said deputies and other employees. They shall also require that any and all persons purchasing or receiving grain on consignment at central market shall give an indemnity bond in a sufficient sum to fully protect the seller against fraud or loss. They shall also formulate rules and regulations governing the conduct of all public warehouses where grain, seed and other agricultural produce is bought, sold or received for storage, and such warehouses shall be bonded in a sum sufficient to amply protect all persons transacting business with them against loss.

"Said state inspector of grades, weights and measures may with the approval of the Commissioners of Railroads, license as deputy inspector the buyer or agent of a privately owned warehouse, provided that said deputy inspector shall pass such examination as to competency as may be prescribed, and give a bond in a sufficient amount, as required according to regulations prescribed by the state inspector of grades, weights and measures.

"All licenses issued to deputy inspectors in private warehouses shall be for the term of one year.

"The conditions of such licenses shall require the holders thereof to well and truly fix grades and actual dockage of all grains inspected by

37 N. D.—41.

them at their respective places of business and to correctly weigh the products so inspected and graded.

"Each licensee shall cause his license to be posted in a permanent and conspicuous place at his regular place of business, and shall not be authorized to inspect, grade, or weigh grain at other places, except with the approval of the Commissioners of Railroads.

"The inspector of grades, weights and measures, shall collect a fee of $10 for each license issued. Licenses are subject to cancelation by the Commission for violation of rules or other good cause.

"It shall be unlawful for any person operating a public warehouse to purchase, weigh, grade or inspect grain or seed who is not licensed as deputy inspector, provided that any person without a license may buy any article that has been graded, weighed and inspected by a deputy state inspector of grades, weights and measures.

"The state inspector of grades, weights and measures shall receive all appeals from the decisions of all deputy inspectors under such rules as shall be approved by the Commissioners of Railroads for reinspection, and the state inspector of grades, weights and measures shall consider the flour and bread producing qualities where such final decision is necessary.

"Any person violating any of the provisions of this act shall be guilty of a misdemeanor and for the first offense shall pay a fine of not less than $10 and not more than $100, or be confined in the county jail not less than ten days nor more than thirty days, or both such fine and imprisonment.

"For each succeeding offense he shall pay a fine of not less than $100, or more than $500 or be confined in the county jail not less than thirty days or more than ninety days, or both such fine and imprisonment.

"There is hereby appropriated the sum of $10,000 for the purpose of putting this law in force and effect, said appropriation to be known as the state public grain grading and weighing fund, which sum shall be replenished and maintained by adding thereto all fees for licenses of deputies and inspecting, weighing and grading, and all salaries or compensation of deputies and employees shall be paid out of this fund. The Commissioners of Railroads shall fix the fees for weighing, grading and inspecting and marketing at a sum sufficient to make the

state grading, inspecting, weighing and marketing department self-sustaining, and in addition, to set aside 25 per cent of all fees collected to create a fund for building public grain storage warehouses within the state."

The first challenge to the constitutionality of the act is to the effect that more than one subject is embraced in its title, and that the act, therefore, violates § 61 of the Constitution of North Dakota, which provides that:

"No bill shall embrace more than one subject, which shall be expressed in its title, but a bill which violates this provision shall be invalidated thereby only as to so much thereof as shall not be so expressed."

It is also claimed that the act itself contains more than one subject.

The title of the act is as follows: "An Act Creating a Uniform State Grade for Wheat, Oats, Barley, Flax, and All Other Grains, Seeds and Agricultural Products; Creating and Establishing the Office of State Inspector of Grades, Weights and Measures and Providing for State Aid for Marketing Facilities and the Establishment of State-Owned Marketing Places and Providing for Inspection of Licensed Warehouses by Competent Accountants, and Expert Grainmen, and Authorizing the Employment of Such Accountants, and Making an Appropriation therefor; and Providing Penalties for the Violation of Any of the Provisions of This Act."

It is first urged by the petitioner and conceded by the attorney general, that the subject of the last clause of the act, which provides that in addition to the "sum sufficient to make the state grading, inspecting, weighing, and marketing department self-sustaining," the Commission "shall raise by fees and license moneys and set aside 20 per cent of all fees collected to create a fund for building public grain-storage warehouses within the state," is not embraced within the title of the act, and is therefore unconstitutional.

This point and this concession are no doubt correct, and we are satisfied that the act is to this extent unconstitutional. This fact and this concession, however, does not of itself nullify the whole statute. We are satisfied, indeed, that the clause may be eliminated and the remainder of the act considered without it, and this under the provisions of § 61 of article 2 of the Constitution, which provides that "no bill

shall embrace more than one subject, which shall be expressed in the title, but a bill which violates this provision shall be invalidated thereby only as to so much thereof as *shall not be so expressed.*" This indeed appears to be the general rule of constitutional construction even in the absence of an express provision to that effect. Cooley, Const. Lim. 3d ed. 211; State v. Bickford, 28 N. D. 36, 87, 147 N. W. 407, Ann. Cas. 1916D, 140; Malin v. Lamoure County, 27 N. D. 149, 50 L.R.A. (N.S.) 997, 145 N. W. 582, Ann. Cas. 1916C, 207.

We can therefore now consider both the title and the body of the act from the standpoint that this clause has been eliminated. And, first, as to the alleged multiplicity in the title itself.

Granting for the sake of argument, that the title does contain more than one subject, this in itself would not be fatal to the validity of the statute. The constitutional provision in question is directed, as far as multiplicity is concerned, to the body of the act, rather than to the title. It provides that "no bill shall embrace more than one subject, which shall be expressed in its title."

As far as the title is concerned, it merely states that it shall express the subject of the act. In the case of Eaton v. Guaranty Co. 11 N. D. 79, 88 N. W. 1029, we hold that "where the subject of a statute is single and the same is expressed in its title, the act will not be invalidated by the fact that the title announces a plurality of subjects."

But the concession we have above made was only made for the sake of argument, as we are satisfied that the title does not in fact contain more than one subject. The subject of the act is the marketing of agricultural products. All else that is contained either in the body of the act or in the title is merely incidental thereto. The constitutional provision "is a very wise and wholesome provision, intended to prevent legislators from being entrapped into the careless passage of bills on matters foreign to the ostensible purpose of the statute as entitled, but it is not designed to require the body of the bill to be a mere repetition of the title; neither is it intended to prevent including in the bill such means as are reasonably adapted to secure the objects indicated by the title." Kurtz v. People, 33 Mich. 279.

The title to an act, indeed, is nothing more or less than an index, and it bears much the same relation to the legislation that is to follow that a crossroads sign does to public traffic. The purpose of the consti-

tutional provision is to prevent the practice which formerly was so common in all legislative bodies, and which even to-day is the standing disgrace of our congressional legislation, of embracing in the same bill incongruous matters having no relation to each other or to the subject specified in the title, and which measures were often adopted without attracting attention; and of combining distinct subjects representing diverse interests, in order to unite the members of the legislature who favored either in support of all. By this means, not only were legislators misled and coerced into voting for measures which otherwise they would have opposed, but the public was misled also. The purpose of the provision, indeed, was, not only to prevent the incorporation in one act of various and diverse subjects, but to serve as a notice or sign-board, not only to the legislators, but also to the public. It was designed to give all parties general notice of what the act contained so that the legislators might protest against unsatisfactory measures and clauses, and the public could in turn protest to their representatives. The mere fact, however, that a signboard states that "this road leads to Buffalo, Casselton, and Fargo," and that the names of Buffalo and Casselton are included as well as Fargo, does not preclude such sign from giving notice to all that the road leads to Fargo. See Sutherland, Stat. Const. § 78.

"If the legislature is fairly apprised of the general character of an enactment by the subject as expressed in its title, and all its provisions have a just and proper reference thereto and are such as, by the nature of the subject so indicated, are manifestly appreciated in that connection, and as might reasonably be looked for in a measure of such character, then the requirement of the Constitution is complied with. It matters not that the act embraces technically more than one subject, . . . so that they are not foreign and extraneous to each other, but 'blend' together in the common purpose evidently sought to be accomplished by the law." State v. Cassidy, 22 Minn. 312, 21 Am. Rep. 765; Winters v. Duluth, 82 Minn. 127, 84 N. W. 789. See also McKone v. Fargo, 24 N. D. 53, 138 N. W. 967; Lewis's Sutherland, Stat. Constr. ¶ 131.

But it is further contended that several subjects are included in the act which are not expressed in the title. It is contended, and no doubt is true, that the act contains provisions as follows:

(1) That the Commissioners of Railroads shall appoint a member of the faculty of the North Dakota Agricultural College to be the state inspector of grades, weights, and measures.

(2) That such state inspector shall receive, in addition to his other compensation, the sum of $1,000 per annum.

(3) That he shall establish and define proper grades and weights for grain, seeds, and other agricultural products; also flour, meal, and products made therefrom.

(4) That such grades and weights shall be approved by the Commissioners of Railroads.

(5) That the Commissioners of Railroads shall authorize the employment of such clerical help as is necessary for the carrying out of the provisions of the act, and determine the compensation to be paid for such service.

(6) That the state inspector shall cause said formula or scale of grades, weights, and measures to be published in not more than five newspapers of general circulation in the state of North Dakota.

(7) That the state inspector shall have power to appoint skilled and competent deputies who shall be stationed at any town or place where grain, seed, and other agricultural products are marketed; provided that the town or community where such deputy is stationed shall at their own expense provide a suitable building and scales for housing said deputy; the upkeep of said building and scales shall be borne by the state out of funds secured on account of fees collected for inspecting and weighing.

(8) That it shall be the duty of the deputy to weigh, inspect, and grade all grain, and to issue certificates therefor, and to sample and grade carload shipments.

(9) That the Railroad Commissioners shall appoint such number of inspectors of public warehouses as may be necessary who shall ascertain whether sufficient bonds and insurance are provided for by each warehouse, to provide methods of accounting, to assist local warehousemen in making public reports, to enforce the rendering of annual and other reports, to see that all laws as regards public warehouses are complied with, to advise and assist local warehousemen in any way that will make for the efficiency and for the safety of the grain marketing business of the state.

(10) That the Board of Railroad Commissioners shall have the power to suspend the license of such warehouses, or, in extreme cases, to ,cancel the ·license of such warehouses, who fail to comply with its directions.

(11) That the Commissioners of Railroads shall have the power to establish as they see fit central markets for the display of samples of grain, seeds, and other agricultural products, and may install a deputy in charge of said central markets, at the cities of Duluth, St. Paul, Minneapolis, Superior, Fargo, Fairmont, Wahpeton, and Grand Forks, and at such other stations as in their judgment shall be necessary to provide adequate marketing facilities. That the charges for said service shall be fixed and determined by them.

(12) That the Commissioners of Railroads shall fix the charges for the services rendered in said market; that they shall establish uniform fees for grading, weighing, inspecting and selling; that all of such fees so collected shall be paid into the treasury of the state of North Dakota; that the Commissioners of Railroads shall fix the salary or compensation to be paid to the deputies and employees; that they shall provide a system of bonding said deputies and other employees; that they shall require that any and all persons purchasing or receiving grain on consignment at a central market shall give an indemnity bond in a sufficient amount to fully protect the seller against fraud or loss; that they shall formulate rules and regulations governing the conduct of all public warehouses, where grain, seed, and other agricultural produce is bought, sold, or received for storage, and that such warehouses shall be bonded in a sum sufficient to amply protect all persons transacting business with them against loss.

(13) That the state inspector of grades, weights, and measures may, with the approval of the Commissioners of Railroads, license as deputy inspector the buyer or agent of a privately owned warehouse, provided that such deputy inspector shall pass such examination as to competency as may be prescribed, and give a bond in a sufficient amount as required, according to regulations prescribed by the state inspector of grades, weights, and measures.

(14) That each licensee shall cause his license to be posted in a permanent and conspicuous place at his regular place of business, and

shall not be authorized to inspect, grade or weigh grain at other places except with the approval of the Commissioners of Railroads.

(15) That the inspector of grades, weights, and measures shall collect a fee of $10 for each license issued.

(16) That it shall be unlawful for any person operating a public warehouse to purchase, weigh, grade, or inspect grain or seed, who is not licensed as deputy inspector, provided that any person without a license may buy any article that has been graded, weighed, and inspected by a deputy state inspector.

(17) That the state inspector shall receive all appeals from the decisions of all deputy inspectors under such rules as shall be approved by the Commissioners of Railroads.

(18) That a violation of any of the provisions of the act shall be a misdemeanor, and that for the first offense a fine of not less than $10 nor more than $100, or confinement in the county jail not less than ten days nor more than thirty days, or both such fine and imprisonment, shall be incurred, and for each succeeding offense a fine of not less than $100 nor more than $500, or confinement in the county jail not less than thirty days nor more than ninety days, or both such fine and imprisonment.

(19) That such fund shall be appropriated the sum of $10,000 for putting the law into force and effect.

(20) That there shall be replenished and maintained by adding thereto all fees for licenses of deputies, and for inspecting, weighing, and grading, and that all salaries or compensations of deputies and employees shall be paid out of this fund.

(21) That the Commissioners of Railroads shall fix the fees for grading, inspecting, and marketing at a sum sufficient to make the state grading, inspecting, and marketing department self-sustaining, and, in addition thereto, set aside 25 per cent of all fees collected to create a fund for building public grain storage warehouses within the state.

As we have before stated, the real subject of the act is the regulating of the marketing of agricultural products, and this purpose, or this subject, is, to our minds, clearly expressed in the title. In considering the title to an act and determining whether the provisions in the body of the act are germane thereto, the general subject must be, and

is, considered, and the specific wording of the title is not always important.

As was held in the case of State ex rel. Poole v. Peake, 18 N. D. 101, 120 N. W. 47, in determining the constitutionality of a legislative act under § 61 of article 2 of the state Constitution, the title is to be considered in the light of the general object and purpose of the act; and if, when so considered, the provisions of the act appear to be in furtherance of the general purposes expressed in the title, the act will be upheld. We held that it is sufficient "if the title, either by express words or *by necessary or reasonable implication from the meaning of its terms,* includes the subject and purposes of the act."

It is not necessary indeed, that the title should specifically state that the purpose of the act is to regulate the marketing of grain and agricultural products. If that purpose is clearly evident from the title, that is, if it is the subject of the act, all matters which are germane thereto, and which are contained in the body, are properly incorporated therein.

In the case of State v. Minneapolis & N. Elevator Co. 17 N. D. 23, 138 Am. St. Rep. 691, 114 N. W. 482, the title of the act was: "An Act Requiring Elevator Companies Transacting Business in This State to Return Certificate of Inspection and Weighmaster's Certificate to the Local Buyer."

The act contained a provision for the return of such certificate by the elevator companies to their local agents, and also that the latter should post the same in a conspicuous place in the elevators.

This court said: "It is asserted that the entire act is void because it contravenes the provisions of § 61 of the state Constitution, which requires that a bill shall embrace but one subject, which shall be expressed in its title. The argument, in brief, is that §§ 1 and 2 each relate to different subjects; the first, to the duty enjoined upon elevator companies to transmit to their local agents the official certificates of inspection and weights; and the second, to the duty enjoined upon the local agents to post such certificates. We are entirely clear that such contention is without merit. It is manifest that the act embraces but one subject or object, to wit, the furnishing to the public such information as may be imparted by the posting, in the elevators of the official certificates mentioned in the act. In furtherance of this general design,

§ 1 requires such certificates to be transmitted by the elevator company to its local agent, and § 2 requires the latter to post and keep posted such certificates in a conspicuous place in the elevator. It is thus apparent that these two sections are closely related to the subject-matter of the act. In fact, the provisions of one would be rendered abortive without the other. The fact that the title of the act is somewhat restricting in its terms does not render the act void, as the provisions of § 2 which are not expressly referred to in the title are, we think, clearly germane to the subject-matter embraced in the title. A reading of the title readily suggests that the body of the act might contain provisions similar to those embraced in § 2; for, without any requirements other than those expressly mentioned in the title, the act would accomplish no useful purpose."

Again, the supreme court of Illinois, in sustaining a conviction for selling liquors to minors under an act whose title was: "A Bill for an Act to Revise the Law in Relation to Licenses," said: "It may be that licenses to sell liquor were not specifically named in the title, but it was undoubtedly so expressed as to call the attention of every senator to the subject-matter of the bill, and we have no doubt that this general expression of the subject of the bill answers the constitutional requirement. The provision does not require that the subject of the bill *shall be specifically and exactly expressed in the title. Hence, we conclude that any expression in the title which calls attention to the subject of the bill, although in general terms, is all that is required.*" Johnson v. People, 83 Ill. 431–436, 2 Am. Crim. Rep. 396.

Again, in the case of Cole v. Hall, 103 Ill. 30, a provision imposing a license fee upon the owners of dogs was held to be germane to and sufficiently expressed in the title: "An Act to Indemnify the Owners of Sheep in Cases of Damage Committed by Dogs."

Again, in the case of O'Leary v. Cook County, 28 Ill. 534, it was held that a provision prohibiting the sale of ardent spirits within 4 miles of a college was sufficiently referred to in and germane to the subject of an act entitled, "An Act to Amend an Act Entitled an Act to Incorporate the Northwestern University." "The object of the charter," the court said, "was to create an institution for the education of young men, and it was competent for the legislature to embrace within it everything which was designed to facilitate that object. Every

provision which was intended to promote the well-being of the institution or its students was within the proper subject-matter of that law. We cannot doubt that such was the single design of this law. . . . This provision . . . was designed for the benefit and the well-being of the institution, and this is the touchstone of the constitutionality of the enactment." See also Abington v. Cabeen, 106 Ill. 200.

Again, in the case of State ex rel. Goodsill v. Woodmansee, 1 N. D. 246, 11 L.R.A. 420, 46 N. W. 970, this court construed the title of an act "to Provide for the Organization and Government of State Banks," to embrace within its subject-matter the business of banking and receiving deposits generally, and upheld as germane to such subject a provision therein which provided that "it shall be unlawful for any individual, firm, or corporation to continue to transact a banking business, or to receive deposits for a period longer than six months immediately after the passage and approval of this act, without first having complied with and organized under the provisions of this act."

In the case of Powers Elevator Co. v. Pottner, 16 N. D. 359, 113 N. W. 703, we held that the title, "An Act Regulating the Filing and Foreclosure of Mechanics Liens upon Land," was broad enough to include within its subject a provision giving a lien to materialmen and laborers.

In the case of State ex rel. Erickson v. Burr, 16 N. D. 581, 113 N. W. 705, we held that the title, "An Act Defining the Boundaries of the Second, Eighth, and Ninth Judicial Districts of the State of North Dakota, and Providing for Terms of Court in said Districts," was broad enough to include a provision for the election of a judge of the ninth district.

It is next contended that the act in question attempts to delegate legislative powers to ministerial officers. It is claimed that it is a legislative power to limit the number of deputies and inspectors, the amount of expenditures, expenses, and salaries; and that this power has been delegated to the inspector and Board of Railroad Commissioners, and that this cannot be done. It is also claimed that it is a legislative act to fix grain grade standards and fees for inspection, and that this power also cannot be delegated.

The first case relied upon by counsel for the petitioner is the case of State ex rel. Rusk v. Budge, 14 N. D. 532, 105 N. W. 724, in which

this court declared that an attempt on the part of the legislature to delegate the power to Commissioners to fix the amount of money to be expended for building a capitol and an executive mansion, the act leaving it to the Commissioners to say how much should be devoted to the erection of the capitol and how much to that of the executive mansion, was an attempt to delegate legislative power, and this notwithstanding the fact that the aggregate cost of both buildings was limited to $600,000.

It is contended that in the case at bar the Board of Railroad Commissioners is authorized to employ necessary clerical help and determine the compensation for such service, and to appoint deputies in towns where the town at its own expense will provide scales and a building therefor.

It is claimed that there is no limit to the number of deputies or inspectors to be appointed, or to the salaries to be paid to the inspectors of public warehouses. It is also claimed that no limit is placed on the cost of the upkeep of the buildings and scales which the towns or localities are required to furnish.

Reliance is also placed upon the case of State ex rel. Miller v. Taylor, 27 N. D. 77, 84, 145 N. W. 425, in which this court said: "The act in question is invalid because it is an unwarranted delegation of purely legislative powers to the Commissioner of Insurance. It requires counties, cities, and other subdivisions of the state to pay premiums, the total sum so paid constituting the bonding fund. This fund is only limited by the number of officials and subdivisions coming within its own provisions, most of which are required to do so, while with some others it is optional. From the total fund the Commissioner is authorized to arbitrarily determine how much will be necessary to pay deputies, clerks, and other expenses of his department, and is required to set aside from such fund the amount so decided upon by him. No limit is placed by the act in question upon the amount which may be used for those purposes. It is left solely with the Commissioner, and only the remaining part of the fund is available to pay liabilities incurred during each year. *The separation of this fund into two parts—one for the payment of expenses and the other for the payment of losses—is a legislative act; and the very least that the legislature can do . . . is*

*to place a limit upon the amount of the fund to be used in the payment of expenses."*

It would seem, however, that the last portion of the quotation from the case of State ex rel. Miller v. Taylor, supra, and just referred to, completely distinguishes the case from that at bar. In the statute passed upon in that case the legislature was attempting to create a state bonding fund. It was requiring municipalities to contribute to that fund. It was requiring them to levy taxes and to make losses good. In the case at bar, however, with the exception of the 25 per cent which we have eliminated, there is no fund which is not created for the one and sole purpose of paying expenses. The act is a license and inspection act, and it is elementary that no fees for inspection can be exacted which are in excess of the sum reasonably necessary for the expenses of enforcement. Bartels Northern Oil Co. v. Jackman, 29 N. D. 236, 150 N. W. 576. It must be presumed, in the absence of a contrary showing, that the $10 license fee, and the other fees exacted, will not be in excess of such requirement. The only power that. is delegated is the power to fix salaries and to determine the number of inspectors, etc. It is true that no limit is placed on the cost of the upkeep of the buildings where scales are kept, but this of course must be reasonable, and all of the expense must be within the limit of the sum total of the fees collected. If such a statute is unconstitutional, then all statutes are unconstitutional which create boards of trustees of our state university, agricultural college, or normal schools, and other schools and public institutions, and which appropriate sums of money for the running expenses of such establishments, but leave it to such trustees to expend the money appropriated as seems to them best, for the purposes specified to make what purchases may be necessary, and to fix the salaries of the professors and other employees. Surely the Constitution has not tied the hands of government to this extent. It has often been said that a democracy must of necessity be more or less inefficient, but surely a democracy is not required to be as inefficient as this. If these details were required, our legislators would have to be in constant session.

Counsel for petitioner also cites the case of Betts v. Land Office Comrs. 27 Okla. 64, 79, 110 Pac. 771, in which the court held repugnant to the Constitution of Oklahoma an act of the legislature which

allowed "the Commissioners of the land office may appoint such assistants and incur such expenses as are necessary in the management and handling of such property and funds, and shall pay such expenses out of the income of the school funds."

It will be noticed, however, that in this act the payment of expenses had to be made out of a general fund for school purposes, and whatever was so used for expenses was taken from the schools. There was no limit on the amount of expense that could be incurred.

In the case at bar there is no other fund but that for expenses after we eliminate the provision for the extra 25 per cent, which we have already done. As we have before said, the statute is a license and inspection statute. Its proceeds can only be used for expenses. The amount of expenses cannot exceed the reasonable cost of regulation. Even the number of deputies and inspecters must of necessity be limited to those who are reasonably necessary to the inspection and regulation, otherwise the license tax would be invalid. The case, then, is entirely different than the one passed upon by the supreme court of Oklahoma in the case of Betts v. Land Office Comrs., supra.

It also differs materially from that passed upon by our own court in State ex rel. Rusk v. Budge, 14 N. D. 532, 105 N. W. 724, and before cited; for in that case there were two funds,—one for the capitol building and one for the governor's mansion,—and the amount of each was left to the Commissioners to determine.

We have also examined the case of State ex rel. Wyatt v. Ashbrook, 154 Mo. 375, 48 L.R.A. 265, 77 Am. St. Rep. 765, 55 S. W. 627. In that case, however, and for reasons given in the opinion, the fee was considered a tax rather than a license fee, as not coming within the police powers of the state, as not being for the purpose of the preservation of the public health, morals, safety, or welfare, and as a tax merely. In such case the tax was not limited by the amount of the expenses of inspection; and the legislature, therefore, neither expressly nor impliedly determined the amount which could be so expended. That case is entirely different from the one at bar.

But it is contended that the act is unconstitutional in that it delegates to the chief grain inspector the power to define and establish grades and weights for grains, seeds, and other agricultural products, and makes it the duty of the deputies to grade all grain, etc., which it also claimed

is a legislative or judicial power. There is no merit, however, in this contention.

The only inhibition of the law is that grain which is not graded shall not be marketed. The statute was passed to meet a peculiar exigency. Its purpose was to prevent fraud and to make it possible for the farmers of the state to ascertain the real nature and quality of their products, and not to be left entirely to the mercy or judgment of the purchaser. Though the purchaser may not buy grain which is not graded, he is still at liberty to refuse to buy the same if he believes the grade to be incorrect and not to meet the requirements of the eastern markets. It is, in fact, outside of the power of the state inspector to dictate to the eastern markets what the grades shall be, or what grades they shall accept or shall not accept. It is equally beyond his power to force a dealer to buy what he does not desire to buy, or to pay a price that he does not desire to pay. The inspector of grades and his deputies, indeed, are nothing more or less than advisers to the farmers; and the legislature seems to be of the opinion that the industry is so great and the interests of the people of the state so directly and universally involved, that the business needs to be regulated, at least to the extent that no sale shall be made unless the farmer has had an opportunity to obtain this expert advice.

With this judgment and determination the courts cannot interfere. The rule, indeed, seems to be quite generally established that "if an act of the legislature would be valid only in the event that certain circumstances existed, it will be presumed that all such circumstances did exist. If it was required that the legislature should have evidence of particular facts in order properly to pass a statute, it is presumed that such evidence was actually and properly before the legislative body, and that it acted on a full knowledge of the facts." 6 R. C. L. 102, 178; Sweet v. Rechel, 159 U. S. 380, 40 L. ed. 188, 16 Sup. Ct. Rep. 43; State ex rel. McCue v. Northern P. R. Co. 19 N. D. 45, 25 L.R.A.(N.S.) 1001, 120 N. W. 869; State v. Armour & Co. 27 N. D. 177, 203, 204, L.R.A.1916E, 381, 145 N. W. 1033, Ann. Cas. 1916B, 548; Armour & Co. v. North Dakota, 240 U. S. 510, 60 L. ed. 771, 36 Sup. Ct. Rep. 440, Ann. Cas. 1916D, 548.

As was said by the Supreme Court of the United States in Armour & Co. v. North Dakota, supra: "We need only deal with the law

under review and the justification for its adoption. Evils attended the method of the company (in the case at bar the method of the marketing of grain) which the Food Commission of the state . . . [in the case at bar the producers of the state generally] thought should be redressed, and which the legislature reasonably believed were definite, and not fanciful, and in this belief passed the law. And the belief, being of that character, removes the law, as we have already said, from judicial condemnation."

Or, as was again said by the National Supreme Court in Central Lumber Co. v. South Dakota, 226 U. S. 157, 57 L. ed. 164, 33 Sup. Ct. Rep. 66: "This court cannot review the economic facts on which the legislature of a state bases its conclusions that an existing evil should be remedied by an exercise of the police power."

It is true that the legislature cannot delegate its power to make a law. It has, however, delegated no such power in the act which is before us. It has merely intrusted to state officials the duty to do certain acts, and has provided by law that sales shall not be made until these acts are done. Much more drastic statutes, indeed, have been sustained by the courts. In the case of Buttfield v. Stranahan, 192 U. S. 470, 48 L. ed. 525, 24 Sup. Ct. Rep. 349, it was held that "an unconstitutional delegation of legislative power to the Secretary of the Treasury was not made by the provision of the Tea Inspection Act of March 2, 1897 (29 Stat. at L. 604, chap. 358, Comp. Stat. 1913, § 8786), forbidding the importation of teas inferior to the government's standards of purity, quality, and fitness, for consumption, which authorizes him to establish such standards upon the recommendation of a board of tea experts, but such provision merely leaves to the Secretary the executive duty to effectuate the legislative policy declared in the statute."

The court, among other things, says:

"By the Act of March 3, 1883 (22 Stat. at L. 451, chap. 64), then in force, any merchandise imported 'for sale as tea,' adulterated with spurious or exhausted leaves, or containing such an admixture of deleterious substances as to make it 'unfit for use,' was prohibited; and exhausted leaves were defined to include any tea which had been deprived of its proper quality, strength, or virtue by steeping, infusion, decoction, or other means. Thus the importation of tea containing

such an admixture of leaves as to be deprived of its proper quality or virtue by any method of treatment was prohibited. The act, however, contained no provision for the establishment of government standards; and the establishment of uniform standards in the interest of the importer and of the consumer had become a recognized necessity. In a report by the Senate Committee on Commerce, in 1897, the provision was suggested as designed, among other things, to protect the consumer against 'worthless rubbish,' and insure his 'receiving an article fit for use.' The report pointed out that the 'lowest average grade of tea ever before known was now being used' by our consumers, and proposed as a remedy the establishment of standards of the 'lowest grades of tea fit for use.' As originally introduced in the House, the bill prohibited the importation of any merchandise as tea which is inferior in purity or fitness for consumption to the standards provided in § 3 of this act.' It was amended in the Senate by inserting the word 'quality' between the words 'purity' and 'fitness for consumption' wherever they occurred in the House bill. The amendment evinces the intention of the Senate to authorize the adoption of uniform standards by the Secretary of the Treasury which would be adequate to exclude the lowest grades of tea, whether demonstrably of inferior purity, or unfit for consumption, or presumably or possibly so because of their inferior quality. The House concurred in the amendment, and the measure was enacted in its present terms. We conclude that the regulations of the Secretary of the Treasury are warranted by the provisions of the act.

"The claim that the statute commits to the arbitrary discretion of the Secretary of the Treasury the determination of what teas may be imported, and therefore in effect vests that official with legislative power, is without merit. We are of opinion that the statute, when properly construed, as said by the circuit court of appeals, but expresses the purpose to exclude the lowest grades of tea, whether demonstrably of inferior purity, or unfit for consumption, or presumably so because of their inferior quality. This, in effect, was the fixing of a primary standard, and devolved upon the Secretary of the Treasury the mere executive duty to effectuate the legislative policy declared in the statute. The case is within the principle of Marshall Field & Co. v. Clark, 143 U. S. 649, 36 L. ed. 294, 12 Sup. Ct. Rep. 495, where it

37 N. D.—42.

was decided that the 3d section of the Tariff Act of October 1, 1890 (26 Stat. at L. 567, chap. 1244), was not repugnant to the Constitution as conferring legislative and treaty-making power on the President, because it authorized him to suspend the provisions of the act relating to the free introduction of sugar, molasses, coffee, tea, and hides. We may say of the legislation . . . considered in Marshall Field & Co. v. Clark, that it does not, in any real sense, invest administrative officials with the power of legislation. Congress legislated on the sub-ject as far as was reasonably practicable, and from the necessities of the case was compelled to leave to executive officials the duty of bringing about the result pointed out by the statute. To deny the power of congress to delegate such a duty would, in effect, amount but to declar-ing that the plenary power vested in Congress to regulate foreign commerce could not be efficaciously exerted.

"Whether or not the Secretary of the Treasury failed to carry into effect the express purpose of Congress, and established standards which operated to exclude teas which would have been entitled to admis-sion had proper standards been adopted, is a question we are not called upon to consider. The sufficiency of the standards adopted by the Secretary of the Treasury was committed to his judgment, to be hon-estly exercised, and if that were important, there is no assertion here of bad faith or malice on the part of that officer in fixing the standards, or on the part of the defendant in the performance of the duties resting on him."

It seems, indeed, to be generally conceded in this age of a varied and complicated social and industrial development, where expert knowledge and supervision is everywhere necessary, that the legislature may make use of the aid of such experts, both as to the general details of super-vision and as to the rates to be enforced and the fees and charges to be exacted. See 6 R. C. L. 178; People v. Harper, 91 Ill. 364; Sara-toga Springs v. Saratoga Springs Gas, E. L. & P. Co. 18 L.R.A.(N.S.) 713 and note (191 N. Y. 123, 83 N. E. 693, 14 Ann. Cas. 606); Com. v. Falk, 59 Pa. Super. Ct. 217.

But it is contended that deputies can, under the provisions of the act, only be appointed in towns and localities which furnish scales and buildings to house the same; and that only such grain dealers may be licensed to inspect and grade as the state inspector may choose. It is

contended, also, that towns and localities may not choose to furnish the scales and buildings; and there is much in this objection when it comes to the practical application of the law. This is not a matter, however, with which the courts may concern themselves. "The legislature is given a large discretion in reference to the means it may employ to promote the general welfare. It is for the legislature alone to judge what means are necessary and appropriate to accomplish an end which the Constitution makes legitimate, and hence the courts cannot undertake to decide whether the means adopted by the legislature are the only means or even the best means possible to attain the end sought, for such course would vest the exercise of the police power of the state in the judicial department. It has been said that the methods, regulations, and restrictions to be imposed to attain, so far as may be, results consistent with the public welfare, are purely of legislative cognizance. The legislative determination of the methods, restrictions, and regulations is final, except when so arbitrary as to be violative of the constitutional rights of the citizen." 6 R. C. L. p. 155, § 154. The legislature, no doubt, was of the opinion that the self-interests of the cities, towns, and localities are so deeply involved, to say nothing of the interests of the buyers of grain, that no difficulty will be experienced from the requirement that such localities shall furnish scales and the buildings necessary thereto, and with our knowledge of human nature, at any rate, with the limited power which is given to us, we do not feel justified in interfering with its discretion and judgment in this matter; nor have we any reason to believe or to act upon the assumption that the state inspector of grades would proceed arbitrarily, or, by failing to appoint and license a sufficient number of inspectors and deputies, will hamper the grain business of the state.

The same considerations apply to the objection that the Railroad Commissioners are given the power to establish markets both within and without the state, and fix charges for the service and establish fees for grading, weighing, inspecting, and selling, and that the act also contemplates the establishment of a public grain storage warehouse within the state. It is well settled, indeed that administrative boards and executive officers may be given the power to perfect the details of a plan, the general outlines of which have been laid down in a statute of the legislature. See 6 R. C. L. 178, 179; Buttfield v. Stranahan,

192 U. S. 470, 48 L. ed. 525, 24 Sup. Ct. Rep. 349; People v. Harper, 91 Ill. 357.

Objection is also made to the act on the ground that the state is engaging in private business. Whether this can be done or not, however, we are not called upon to determine. It is sufficient to say that the state is not engaging in private business; that is to say, if we eliminate the provision for the 25 per cent for the erection of a public warehouse, and which we have already done on other grounds.

The protection of the farmers of a state from possible fraud, and advising them as to the nature and quality of their grain and other products, is especially in the state of North Dakota, which depends almost entirely upon its agricultural resources and whose whole population are either directly engaged in farming or are dependent upon the wealth which comes from the land, and which even now is being urged by the national government to enter into the farming industry and to develop its resources to their fullest extent, is certainly not private in its nature, but is essentially public.

Although, too, the *amicus curiæ,* who has appeared in this case, seems deeply solicitous for the welfare of the so-called track buyers, and urges their claims as well as those of the petitioner herein, it by no means follows that the interests of these dealers are or will be seriously affected. No track buyer at any rate is now before us, as the learned *amicus* not only does not disclose the names of any of his clients, if indeed an *amicus* can have clients, but as far as we can learn none of them have been arrested. It is also self-evident that in a habeas corpus proceeding the liberty of the petitioner is the only matter involved and the only interest concerned, and that no intervention can be had on the part of other persons, especially on the part of those who have not even been arrested.

It is a matter also of common knowledge, and of which the courts may well take judicial notice, that it is the desire of localities to reap benefits from the local retail trade in all lines which comes from a local grain market, that has largely created the local track buyer, and the legislature may well have considered that the same considerations which in the past have encouraged local co-operation in track buying will in the future cause such localities to furnish the necessary scales, and thus render track buying easy and legitimate.

One of the points, however, which the learned *amicus curiæ* especially urges goes to the validity of the whole act, and affects the petitioner Gaulke, as well as the more or less nebulous track buyer, and in order that he may raise this point the *amicus curiæ* has been allowed to join in the brief of such petitioner. This point is that the statute deprives the petitioner of liberty and property without due process of law, and denies to him the equal protection of the laws, it being urged that such petitioner is denied the right to buy from whom and as he pleases.

In support of this contention the case of Adams v. Tanner, 244 U. S. 590, 61 L. ed. 1336, L.R.A.1917F, 1163, 37 Sup. Ct. Rep. 662, Ann. Cas. 1917D, 973, is cited. In it the Supreme Court of the nation held a statute to be unconstitutional which was directed against private employment agencies, and which made it criminal in the state of Washington to collect fees from workers for furnishing them with employment or with information leading thereto, the court holding the business to be a useful business and the statute an arbitrary interference therewith. This decision, however, was dissented from by four out of the nine judges; and, even if applicable to the case at bar, is in the opinion of the writer and of four of the dissenting judges of the Supreme Court of the nation itself, contrary to a long line of decisions of the same court, and the majority of this court is firmly of the opinion that the rule therein announced will not be extended further than the particular case involved.

The contrary cases referred to are collected in the dissenting opinion of Mr. Justice Brandeis, and, to quote from the language of the eminent jurist, show: "That the scope of the police power is not limited to regulation as distinguished from prohibition. They show also that the power of the state extends equally, whether the end sought to be attained is the promotion of health, safety, or morals, or is the prevention of fraud or is the prevention of general demoralization. 'If the state thinks that an admitted evil cannot be prevented except by prohibiting a calling or transaction not in itself necessarily objectionable, the courts cannot interfere unless in looking at the matter they can see that it "is a clear unmistakable infringement of rights secured by the fundamental law." ' . . . . Or, as it is so frequently expressed, the action of the legislature is final unless the measure adopted appears

clearly to be arbitrary or unreasonable, or to have no real or substantial relation to the object sought to be attained. Whether a measure relating to the public welfare is arbitrary or unreasonable, whether it has no substantial relation to the end proposed, is obviously not to be determined by assumptions or by *a priori* reasoning. The judgment should be based upon a consideration of relevant facts actual or possible,—*ex facto jus oritur*. That ancient rule must prevail in order that we may have a system of living law. It is necessary to inquire, therefore, what was the evil which the people . ·. . sought to correct. Why was the particular remedy embodied in the statute adopted, and incidentally, what has been the experience, if any, of other states or countries in this connection? But these inquiries are entered upon, not for the purpose of determining whether the remedy adopted was wise, or even for the purpose of determining what the facts actually were. *The decision of such questions lies with the legislative branch of the government* . . . The sole purpose of the inquiries is to enable this court to decide whether in view of the facts, actual or possible, the action of the state . . . was so clearly arbitrary or so unreasonable that it could not be taken 'by a free government without a violation of fundamental rights.' "

This quotation expresses the ruling of the Supreme Court of the United States in scores of cases, and we are clearly satisfied that the majority opinion in the case of Adams v. Tanner, supra, is outside of that line of authority. It at any rate only became a decision by the majority vote of one judge.

The rule generally announced, indeed, is stated in the case of Powell v. Pennsylvania, 127 U. S. 678, 685, 32 L. ed. 253, 256, 8 Sup. Ct. Rep. 992, 1257, where the court held to be valid a statute of the state of Pennsylvania which absolutely forbade the manufacture of oleomargarin or any article designed to take the place of butter, and which was not produced from milk or cream. This state legislation was, and is still, upheld in spite of the fact that in other decisions it has since been held that oleomargarin is not necessarily injurious, and, not being necessarily injurious, is entitled to the protection of the commerce clause of the Constitution. See Collins v. New Hampshire, 171 U. S. 30, 43 L. ed. 60, 18 Sup. Ct. Rep. 768.

In passing upon this question, the court, in the Powell Case, said: "The power which the legislature has to promote the general welfare

is very great, and the discretion which that department of the government has, in the employment of means to that end, is very large. While both its power and its discretion must be so exercised as not to impair the fundamental rights of life, liberty, and property, and while, according to the principles upon which our institutions rest, 'the very idea that one man may be compelled to hold his life, or the means of living, or any material right essential to the enjoyment of life, at the mere will of another, seems to be intolerable in any country where freedom prevails, as being the essence of slavery itself,' yet, 'in many cases of mere administration, *the responsibility is purely political, no appeal lying except to the ultimate tribunal of the public judgment,* exercised either in the pressure of public opinion or by means of the suffrage.' Yick Wo v. Hopkins, 118 U. S. 370, 30 L. ed. 226, 6 Sup. Ct. Rep. 1064. The case before us belongs to the latter class. The legislature of Pennsylvania, upon the fullest investigation, as we must conclusively presume, and upon reasonable grounds, as must be assumed from the record, has determined that the prohibition of the sale, or the offering for sale, or having in possession to sell, for purposes of food, of any article manufactured out of oleaginous substances or compounds other than those produced from unadulterated milk or cream from unadulterated milk, to take the place of butter produced from unadulterated milk or cream from unadulterated milk, will promote the public health, and prevent frauds in the sale of such articles. *If all that can be said of this legislation is that it is unwise, or unnecessarily oppressive to those manufacturing or selling wholesome oleomargarin, as an article of food, their appeal must be to the legislature or to the ballot box,* not to the judiciary. The latter cannot interfere without usurping powers committed to another department of government."

The real basis and holding of the case of Powell v. Pennsylvania, taken in connection with Collins v. New Hampshire and the other oleomargarin cases, is that, as long as interstate commerce is not affected, a state is free to develop its own resources in the manner that it thinks the wisest and best; and that if it considers dairying and agriculture to be its paramount interest, and that the manufacture of oleomargarin or any other business or practice unduly interferes with and threatens the prosperity of that interest, such manufacture or such practice can be made to step aside and be regulated, and even prohibited.

Again, in the case of Booth v. Illinois, 184 U. S. 425, 429, 46 L. ed. 623, 626, 22 Sup. Ct. Rep. 425, in passing upon a statute which prohibited the buying or selling of grain options, the United States Supreme Court said: "We . . . cannot adjudge that the legislature of Illinois transcended the limits of constitutional authority when enacting the statute in question. In reaching this conclusion we have recognized the principle long established and vital in our constitutional system, that the courts may not strike down an act of legislation as unconstitutional unless it be plainly and palpably so. The statute here involved may be unwise, but an unwise enactment is not necessarily for that reason invalid. It may be, as suggested by counsel that a steady and vigorous enforcement of this statute will materially interfere with the handling and moving of vast amounts of grain in the West which are disposed of by contracts or arrangements made in the board of trade in Chicago, but those are suggestions for the consideration of the Illinois legislature. The courts have nothing to do with the mere policy of legislation."

Again, in the same opinion, it says: "The argument, then, is that the statute directly forbids the citizen from pursuing a calling which in itself involves no element of immorality, and therefore, by such prohibition, it invades his liberty as guaranteed by the supreme law of the land. Does this conclusion follow from the premise stated? Is it true that the legislature is without power to forbid or suppress a particular kind of business where such business, properly and honestly conducted, may not in itself be immoral? We think not. A calling may not in itself be immoral, and yet the tendency of what is generally or ordinarily, or often done, in pursuing that calling, may be towards that which is admittedly immoral or pernicious. If, looking at all the circumstances that attend, or which may ordinarily attend, the pursuit of a particular calling, the state thinks that certain admitted evils cannot be successfully reached unless that calling be actually prohibited, the courts cannot interfere, unless, looking through mere forms and at the substance of the matter, they can say that the statute, enacted professedly to protect the public morals, has no real or substantial relation to that object, but is a clear and unmistakable infringement of rights secured by the fundamental law."

The same considerations apply to statutes which are directed for the

protection of the public welfare generally, as those which are directed towards the protection of the public morals. See State v. Peel Splint Coal Co. 36 W. Va. 802, 17 L.R.A. 385, 15 S. E. 1000; Harbison v. Knoxville Iron Co. 103 Tenn. 421, 56 L.R.A. 316, 76 Am. St. Rep. 682, 53 S. W. 955; Knoxville Iron Co. v. Harbison, 183 U. S. 13, 46 L. ed. 55, 22 Sup. Ct. Rep. 1; Dayton Coal & I. Co. v. Barton, 183 U. S. 23, 46 L. ed. 61, 22 Sup. Ct. Rep. 5.

No one will deny that there is an admitted evil in the grain grading and marketing in the state of North Dakota, and throughout the Northwest generally. If a state, when an admitted evil exists, may go to the extent of prohibiting a calling altogether, it may certainly go to the extent of regulating it. We, as a court, cannot say that the statute which is before us, and which was enacted professedly to protect the grain producers and the farmers of the state from the evils incident to that system, has no real or substantial relation to the object involved. Such being the case, under the decisions of the Supreme Court of the United States and of the country generally, we cannot interfere, as those matters are for legislative, and not judicial determination.

Generally speaking, too, what the people believe is for the public welfare must be accepted as tending to promote the common welfare, whether it does in fact or not. Re Viemeister, 103 Am. St. Rep. 859, and note (179 N. Y. 235, 70 L.R.A. 796, 72 N. E. 97, 1 Ann. Cas. 334), 6 R. C. L. 112.

It is further contended that the act in question is unreasonable, because it deprives one farmer of the right to sell seed grain to another without having it first properly inspected. There is, however, no merit in this contention. In the first place, no farmer is complaining. In the second place, the act is clearly confined to marketing, and does not relate to transactions such as those suggested.

Nor is the act in so far as the petitioner Gaulke is concerned invalid in that it interferes with the interstate prerogatives of the Federal Congress, and provides that any person purchasing grain through a central market within or without the state must furnish a bond, and because it is clear that purchasers who operate and live in Minnesota, etc., cannot be required to furnish the instrument, nor can the right of contract be interfered with.

Whether this clause would be valid or not if properly attacked, and

by a party interested, we are not called upon to determine, and cannot determine in this case, and an expression of opinion would be *obitum* merely. As far as we know, the Commissioners of Railroads have as yet created no central markets, nor have they required any bonds to be given. The petitioner certainly has no grievance in that respect. He is merely the agent of a local warehouse, and in the North Dakota town of Thompson. Even if the clause is invalid, it would not affect the rights of the petitioner, or afford him any relief, nor would it invalidate the whole act, as the clause in question can be easily separated from the remainder, and the remainder be allowed to stand without its incorporation. Being, too, a regulation to prevent fraud, and being applicable to all alike, we, upon the limited investigation which the necessity of a speedy determination of this case and the issues actually involved demand, can see no fault in it.

Nor is it necessary to consider the other exterritorial aspects of the statute that is before us. None of them are involved in the case at bar. When private rights are affected thereby and they are properly presented, it will be time enough to consider them.

It is also urged that the local grain buyers who have been licensed as deputy inspectors cannot be forced to inspect, grade, and weigh grain that they do not buy, without compensation, and even then cannot be compelled to render this service if they do not wish to. There is, however, no merit in this contention. In the first place, there is here no contention that the petitioner has been sought to be compelled to do any such thing. In the second place, the Commissioners of Railroads have the power given to them by the act to provide for fees if they so desire. In the third place, if the local grain buyers refuse to perform the service, other deputies may be appointed.

It is true that these local buyers may be more or less interested, but this is a matter for the legislature, and not the courts, to pass upon. "All political power is inherent in the people, Const. art. 1, § 2. And the Constitutions are the only means employed by a free people to limit the power of their agents." State ex rel. Miller v. Taylor, 22 N. D. 362, 133 N. W. 1046. Possible prejudice then is not for us to consider. Home Teleph. & Teleg. Co. v. Los Angeles, 211 U. S. 265, 53 L. ed. 176, 29 Sup. Ct. Rep. 50.

But it is maintained that the act as a whole is invalid on the ground

that the Board of Railroad Commissioners are given the power to establish markets both within and without the state, and to fix charges for the service, and to establish fees for grading, weighing, inspecting, and selling. It is argued that the state is thus engaging in private business, and that the Constitution prohibits it from so doing.

This question in its broadest aspects, however, need hardly be met; for, as we have before stated, the regulation of the public marketing of the products of a state is essentially a public interest, and we find no clause in the Constitution which prohibits such acts and regulations.

Counsel indeed cites us to but one provision, and that is clearly inapplicable. It is § 185 of article 12 of the Constitution, which provides that: "Neither the state or any county, city, township, town, school district, or any other political subdivision shall loan or give its credit or make donations to or in aid of any individual, association, or corporation, except for necessary support of the poor, nor subscribe to or become the owner of the capital stock of any association or corporation, nor shall the state engage in any work of internal improvement unless authorized by a two-thirds vote of the people."

The acts authorized by the statutes which are before us clearly create no internal improvement as that phrase has for the last two hundred years been generally used and understood. Nor do they loan money to or make any donation to or in aid of any individual, association, or corporation.

It is true that in the case of State ex rel. Miller v. Taylor, 27 N. D. 77, 145 N. W. 425, there are expressions of opinion as to the legitimate functions of government, which express the *laissez faire* theory and would make that government a policeman merely, but these are *obiter* and expressions of opinion merely.

Generally speaking, it is a recognized principle of constitutional law that, except where limitations can be imposed by the Federal or state Constitutions, the power of the legislature is unlimited and practically absolute, and that, therefore, it covers the whole range of legitimate legislation. The general rule is that if limitations upon its exercise are not found in the Constitutions, they do not exist. It is sometimes said that an act cannot be opposed to the spirit of the Constitution, yet the spirit of a Constitution is to be collected chiefly from its terms. See Chief Justice Marshall in Sturges v. Crowninshield, 4 Wheat. 122,

202, 4 L. ed. 529, 550; Jacobson v. Massachusetts, 197 U. S. 11, 49 L. ed. 643, 25 Sup. Ct. Rep. 358, 3 Ann. Cas. 756. And the courts are not at liberty to declare an act void because it is opposed to the spirit supposed to prevade the Constitution, or because it is against the nature and spirit of the government, or is contrary to the general principles of liberty, or the genius of a free people, unless the limitation is necessarily implied from the express words which have been used. In every case, indeed, the courts, in order to be justified in declaring an act unconstitutional, must be able to point out the specific provision of the Constitution which is violated.

"When the fundamental law has not limited, either in terms or by necessary implication, the general powers conferred upon the legislature, we cannot declare a limitation under the notion of having discovered something in the spirit of the Constitution upon a subject which is not even mentioned in the instrument." People ex rel. Smith v. Fisher, 24 Wend. 215, 220; Cooley, Const. Lim. 5th ed. pp. 201–206; 6 R. C. L. 104.

Even the provisions that no person shall be deprived of life, liberty, and property without due process of law, and that everyone shall be entitled to the equal protection of the laws, which are contained in the Federal Constitution, and which have been paraphrased into the Constitutions of all of the separate states, have from an early time been construed as conferring no new rights, but as merely guaranteeing the permanence of those existing at the time of the adoption of the instruments.

At these times, and for a long period prior thereto, trade and industry were and had been frequently regulated by the governments, both state and national; and in England as well as in America, and from time immemorial, restrictions had been placed on commerce and industry for the broader purposes of the common good and for the development of the industry and the commerce of the realm. Especially was and has been this true in the cases of wool, tobacco, grain, and other agricultural products. See Turner v. Maryland, 107 U. S. 38, 27 L. ed. 370, 2 Sup. Ct. Rep. 44; Patapsco Guano Co. v. Board of Agriculture, 52 Fed. 690; Pittsburgh & S. Coal Co. v. Louisiana, 156 U. S. 590, 39 L. ed. 544, 5 Inters. Com. Rep. 18, 15 Sup. Ct. Rep. 459; People v. Harper, 91 Ill. 357; 10 Rose's Notes (U. S.) 449.

Nor is the act invalid because it attempts to compel the commission of an illegal act on the part of the municipalities, and to compel them to furnish scales, etc. In the first place there is no compulsion. In the second place, the municipalities are entirely within the legislative control, and it is just as competent for the legislature to authorize them to furnish scales, as it is to authorize them to establish local markets and market places; and of this power there can be no question.

It is also urged that the act in question is unconstitutional for the reason that, in addition to the provisions for the grading, inspecting, etc., it provides for an appropriation of $10,000 for the purpose of carrying out the provisions of the act. The claim is generally made that an act containing an appropriation may not contain any other provisions. Although this is undoubtedly true under the Constitutions of a number of the states (see Ritchie v. People, 155 Ill. 99, 29 L.R.A. 79, 46 Am. St. Rep. 315, 40 N. E. 454), it is not true under the Constitution of North Dakota. Here it is only the general appropriation bill which is required to contain nothing but appropriations. See Const. § 62. As far as other measures and other appropriations are concerned, the only requirement is that such "appropriations shall be made by separate bills each embracing but one subject." Const. § 62. The subject of the bill is, as we have before said, the regulation of marketing, and the appropriation, which is to be used for the general purpose or subject, is merely an incident thereto. This we believe to be the clear import of the language of the constitutional provision. Hill v. Rae, 52 Mont. 378, L.R.A.1917A, 495, 158 Pac. 826, 830. It is certainly the construction which has been placed upon it by every legislative assembly since the beginning of statehood.

The motion to quash the writ of habeas corpus is granted.

Robinson, J. (dissenting). This is a habeas corpus case arising under an act for the inspection of grain and many other things. For the buying of wheat that had not been inspected the defendant was arrested as a common criminal, charged with the commission of a misdemeanor. He claims that the Grading and Inspection Act is unconstitutional; that it is contrary to the Constitution of the state and the 14th Amendment of the Federal Constitution. The act is a long, ill constructed, ungrammatical, multifarious, hodgepodge document. It

was senate bill 314 [Laws 1917, chap. 56]. Without any consideration the bill was rushed through toward the close of the last session of the legislature. It was not read at length as required by the Constitution.

Sec. 63. Every bill shall be read three several times, and the first and third readings shall be at length.          -

Sec. 61. No bill shall embrace more than one subject, which shall be expressed in its title.

The title when subdivided into its leading parts or subjects is as follows:

(1) An act creating a uniform state grade for wheat, oats, barley, flax, and other grains.

(2) An act creating the office of state inspector of grades, weights, and measures.

(3) An act providing state aid for marketing facilities and the establishment of state-owned marketing places.

(4) An act providing for the inspection of licensed warehouses by competent accountants, authorizing the employment of accountants and making an appropriation therefor, and providing penalties for the violation of the act.

So far as material to the case, the act is in effect:

The Railroad Commissioners may appoint an inspector of grades, weights, and measures from the faculty of the Agricultural College, and the inspector shall proceed at once to define and establish proper grades and weights for grain. He may appoint deputies at any town or place where grains are to be marketed, and if the town or community shall, at its own expense, provide a suitable building and scales for housing the deputy, the upkeep of the building and scales shall be borne by the state. The Commissioners may appoint any number of inspectors they may deem necessary. They may establish central markets, either within or without the state, and install deputies in charge of the same and fix the charges for their services. They shall also establish uniform fees for grading, weighing, inspecting, and selling, and fix the salary and compensation to be paid deputies and employees. The inspector shall charge a fee of $10 for every license issued to a deputy.

Obviously the subject of the act is not expressed in its title, and it does contain more than one subject. As shown by its title, the

leading purpose of the act is *to establish a uniform state grade for wheat,. oats, and other grains,* and yet the act nowhere creates or attempts to create a uniform state grade or any grade whatever. It merely undertakes to delegate the power of creating such a grade and the power of doing numerous other things which have no necessary connection. That is all clear and manifest. The leading subject of the act is *to create a uniform state grade.* This, the act does not attempt to do.

In the majority opinion it is said the title does not contain more than one subject, and that the subject of the act *is the marketing of agricultural products.* But that is obviously untrue. The subject as expressed in the title of the act is not the marketing of agricultural products, and if we may amend the title by a reference to the body of the act, contrary to the decision of this court in Turnquist v. Cass County Drain Comrs. 11 N. D. 514, 92 N. W. 852, we may as well say it should be entitled thus: "An Act to Create a Huge Grafting System and to Deny Farmers the Right to Sell their Grains without Paying to Some Inspector an Unknown and Unlimited Graft on Each and Every Load." As there can be no sale without a purchaser, the denial of the right to purchase is a denial of the right to sell. The graft is such a sum as may be fixed by the chief inspector and his deputies without consulting any seller of grain. It may be fixed at 10 cents or $1 on each load of grain. The inspector is given the discretion, and it is not subject to review by the courts.

In marketing a load of grain, the farmer has no time to adjust the graft. He must pay whatever is demanded, though it be a gross imposition. The act gives him no protection. The rates are to be fixed by those who profit by the graft. The farmer who hauls his grain to market may have **to** haul it home again, as he has no guaranty of finding a deputy inspector.

The first section of the penal clause reads thus: "It shall be unlawful for any person operating a public warehouse to purchase, weigh, grade or inspect grain or seed who is not licensed as deputy inspector, provided that any person without a license may buy any article that has been graded, weighed and inspected by a deputy state inspector." The right to purchase without inspection is not forbidden only to: *"Any person operating a public warehouse."*

But as the act does purport to give the Commissioners and the

inspector a legislative power, they declare that it is unlawful for a track buyer to purchase grain without inspection by a deputy, and thus the track buyer is put out of business, unless he can purchase a license as a deputy inspector. That does away with competition which has been of great value to the sellers of grain. The deputy inspector and weigher must have scales to weigh. In all grain elevators the weighing scales are on the main floor, which is from 5 to 6 feet above the level of the ground, to give place for a grain pit under the floor. The farmer drives his load onto and off the main floor by going up and then down an incline of about 15 per cent. When the load and wagon are weighed, the grain is dumped into the pit under the main floor and the wagon is weighed, and the difference gives the net weight. No man drives a load of grain up and down the inclined plane, sells it to a track buyer, and then drives up and down the plane to have his wagon weighed. If he should undertake to do it, he might be forced to wait an hour for every weighing. And in driving his loaded wagon down the inclined plane he might find it very dangerous. The track buyer must go out of business if he cannot weigh on scales of his own, or city scales, or on some private scales.

The grower of grain is not a chump or a dolt. In grain matters he does not need a guardian. He may have scales of his own; he may weigh on the scales of a neighbor. He may weigh his grain by measuring it in the wagon box. He may ascertain the proper dockage by measuring and weighing and cleaning a bushel of grain. When a man lives by growing and handling grain, he soon learns how to grade it, to measure it, and to weigh it; but how may he sell his grain if the law makes it a crime to purchase it?

Now, under the plain words of the state Constitution, every person has a right to acquire and dispose of property, and to pursue and obtain safety and happiness. He has a right to buy and sell grain without paying a graft to anyone. The graft of the inspection and weighing of a load of grain may be 10 cents or it may be $1. The act does not limit the amount which may be fixed and demanded. The constitutional validity of the statute is to be determined by what may be done under it by the worst set of grafters.

Defendant claims the benefit of the 14th Amendment of the Federal Constitution. It declares no state shall make or enforce any law which

shall abridge the privileges or immunities of the citizens of the United States; nor shall any state deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the law.

This great Amendment has been given a liberal construction. In a recent case the United States Supreme Court held void an initiative measure adopted by the people of the state of Washington. The design of the measure was to put out of business all persons conducting an employment agency. The court cited with approval former decisions holding that the liberty mentioned in the amendment means not only the right of the citizen to be free from the mere physical restraint of his person, but the term is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work when he will and to earn his livelihood by any lawful calling; to pursue any livelihood or avocation, and for that purpose to enter into all contracts which may be proper and essential to his carrying out to a successful conclusions the purposes above mentioned.

The right of a person to make fair and honest contracts of sale or purchase cannot be legally hampered by any arbitrary actions of third parties. The legislature may not delegate to a third party the right to fix the terms and conditions on which a farmer may sell or buy a load of grain.

So far as the act provides for the state aiding and mixing into private grain business, it is in conflict with this section of the Constitution:

"Section 185. Neither the state nor any county, city, township, town, school district or any other political subdivision shall loan or give its credit or make donations to or in aid of any individual, association or corporation, except for necessary support of the poor."

For these several reasons the act in question is clearly void.