A. M. NEER, Appellant, v. STATE LIVE STOCK SANITARY BOARD, Respondent.

(168 N. W. 601.)

**Federal Constitution — amendments of — state constitutions — no new rights given by — permanence of those existing guaranteed.**

1. The 5th and 14th Amendments of the Federal Constitution, and their counterparts in the Constitutions of the several states, gave no new rights, but merely guaranteed the permanence of those already existing.

**Due process of law — meaning of term — depends upon circumstances and constitutional provisions — preliminary court procedure — police power — of state.**

2. What is, and what is not, due process of law depends upon the circumstances, and the constitutional provisions which provide for a preliminary court procedure are often held to have no application to statutes which are passed in the exercise of the so-called police power of the state.

**Nuisances — abatement of — summary procedure — judicial procedure — may be without — common law — constitutions.**

3. Sometimes summary proceedings are necessary, and the summary abatement of nuisances without judicial procedure was well known to the common law prior to the adoption of the state and Federal Constitutions.

**Nuisance — property right — none in — public weal — things harmful to.**

4. There is no property right in that which is a nuisance and no right of liberty in that which is harmful to the public weal.

**Private industry — state may interfere with — when public welfare requires — legislature — discretion — what interests are public — determination of measures necessary — procedure.**

5. The state may interfere with private industry whenever the public welfare demands, and in this particular a large measure of discretion is necessarily vested in the legislature to determine not only what the interests of the public require, but what measures are necessary for the protection of these interests.

**Administrative board — powers of — delegated to — by state — reasonable regulations — tests deemed necessary — may adopt — to ascertain existence of disease — law's execution — a mere procedure in.**

6. The state may delegate to an administrative board the power to adopt reasonable regulations and to adopt what tests it deems necessary in order to ascertain the existence of a disease. This is not a delegation of legislative power. It merely relates to a procedure in the law's execution.

**Live Stock Sanitary Board — finding or adjudication of — not conclusive upon owner — that nuisance exists — terms of statute — owner of stock — trial by jury — right of — damages preserved.**

7. The finding or adjudication of a live stock sanitary board cannot generally be made conclusive upon the owner as to the fact and existence of the nuisance, or that it comes within the terms of the statute prohibiting it, so as to deny the owner the right to a trial by jury and the recovery of damages, if the property so destroyed is not, in fact, a nuisance, or does not, in fact, come within the terms of the statute. Summary proceedings, however, may be authorized by the legislature against the thing declared to be a nuisance, and such property may be destroyed without a hearing before a jury provided that the right to the action for damages remains. Due process of law is not violated by such a procedure.

**Quarantine — by public board — statute — authorizing — killing of animals — nuisance — to abate — discretion of board — courts cannot interfere — in absence of fraud — or palpable mistake of fact.**

8. Where a statute authorizes a public board to quarantine or kill disease-infected animals, the determination of which of the two remedies shall be adopted lies within the discretion of the board, and such discretion cannot be reviewed by the courts in the absence of fraud or palpable mistake of fact.

In all of such matters the only question in which the courts or the juries are concerned is the ultimate question whether the animal was diseased or not, or came within the provisions of the statute.

**Complement fixation test — for detection of disease — dourine — live stock association — discretion of — courts will not interfere.**

9. The so-called complement-fixation test for the detection of the disease known as dourine appears to meet with the approval of the scientists of both the United States and Canada; and the courts will not interfere with the discretion of the Live Stock Sanitary Board in adopting the same, and in ordering horses to be killed, which react thereto, even though it is a chemical test merely and the horses show no physical symptoms of the disease.

**Live stock association — discretion of — horses infected with dourine — killed or isolated — determination of board — final as to action taken.**

10. Section 2686 of the Compiled Laws of 1913 leaves it to the discretion of the Live Stock Sanitary Board whether horses which are infected with the disease known as dourine shall be killed or isolated, and the courts will not interfere with or seek to control such discretion.

**Animals — destruction of diseased animals.**

11. The fact that the disease known as dourine can only be communicated in the act of breeding, and that the owners of diseased mares offer to isolate the same and give bonds that they shall not be bred, do not prevent the Live Stock Sanitary Board from ordering their destruction.

On Petition for Rehearing.

**Legislature — police power — may exercise — diseased animals — quarantine — destruction of — may provide for.**

12. The legislature may, in the exercise of the police power, provide for the quarantine of diseased or suspected animals and for the destruction of animals actually infected with contagious diseases.

**Board may quarantine animals infected — contagious or infectious — animals in fact so infected — may kill.**

13. Under the laws of this state the Live Stock Sanitary Board is empowered to quarantine any domestic animal which is infected with a contagious or infectious disease, or which may have been exposed to infection therefrom; but it has no power to kill an animal unless it is in fact infected with a contagious or infectious disease.

**Animals — killing or placing in quarantine — determination of question — lies with sanitary board.**

14. Whether it is necessary to kill an animal infected with dourine, or whether a quarantine is sufficient, are questions to be determined by the Live Stock Sanitary Board. And it is *held* that if the mare involved in this litigation is in

fact infected with dourine, the defendant board has power to order her destruction; but if she is in fact free from contagious or infectious disease, the defendant board has no power or jurisdiction to order such destruction.

**Dourine — animal suspected of being infected with — apparent good health of — lapse of time — clinical symptoms of disease not manifest — animal free from disease — probability.**

15. In the case at bar where more than three years have elapsed since the defendant board ordered the mare killed, and it appears that she has been in the past and is at the present time in apparent good health, and has at no time manifested any clinical symptoms of dourine, conditions so unusual are presented as to indicate a strong probability that the mare is in fact free from such disease, and it is ordered that the case be remanded for a new trial upon the question of whether the mare is in fact infected with dourine.

Opinion filed May 4, 1918.   Rehearing denied August 6, 1918.

Action to restrain the killing of a diseased horse.

Appeal from the District Court of McKenzie County, Honorable *Frank Fisk*, Judge.

Judgment for defendant.   Plaintiff appeals.

Affirmed.

*Burdick & Converse*, for appellant.

To permit the destruction of the property here in question would amount to the taking of property without due process of law, and that the legislative act so authorizing is unconstitutional.   Martin v. Tyler, 4 N. D. 278, 25 L. R. A. 838, 60 N. W. 392; Comp. Laws 1913, §§ 2687, 2688.

The board created by the selection of three experts to examine animals suspected of disease does not constitute a tribunal nor a court, in the sense that the requirements of due process of law are met.   The constitutions are framed upon the principle that the courts are the guardians of the personal and property rights of the citizen. Any statute which seeks to deprive citizens of the right to look to the courts for protection is in conflict with the Constitution.   6 R. C. L. 434, 456, 460-462.

To justify an interference with the personal liberty of a man who was quarantined on account of the prevalence of smallpox, there must be a necessity for such action in his particular case.   Re Smith, 146 N. Y. 68, 28 L.R.A. 820, 40 N. E. 497; Murst v. Warner, 102 Mich.

238, 26 L.R.A. 484, 60 N. W. 440; Wilson v. Alabama G. S. R. Co.
77 Miss. 714, 52 L.R.A. 357; Pierce v. Dillingham, 203 Ill. 148, 62
L.R.A. 888.

There must be an equally clear necessity to justify the invasion of
one's property rights. State ex rel. Adams v. Burdge, 95 Wis. 390,
37 L.R.A. 157, 70 N. W. 347; State v. Duckworth, 5 Idaho, 642, 51
Pac. 456; Morton v. New York, 140 N. Y. 207, 22 L.R.A. 241, 95
Am. St. Rep. 199; People v. Bieseker, 169 N. Y. 53, 88 Am. St. Rep.
534, 61 N. E. 990; Lawton v. Steele, 119 N. Y. 226, 16 Am. St. Rep.
813, 819; Pierce v. Dillingham, 203 Ill. 148, 62 L.R.A. 888; Toledo
Wabash & W. R. Co. v. Jacksonville, 67 Ill. 37, 16 Am. St. Rep. 611.

"Where rights are infringed, where sound principles are over-
thrown, where the general system of law is departed from, the legisla-
tive intention must be expressed with irresistible clearness to induce
a court of justice to suppose a design to effect such objects." 2 Cranch,
390, 2 L. ed. 314.

Under the statutes in question it is immaterial that the board acted
in good faith and in accordance with the law, in the destruction of
supposedly diseased animals. The fact as to whether or not the ani-
mals had the disease is still open to investigation in court. Miller v.
Horton, 10 L.R.A. 116; Pearson v. Zehr, 138 Ill. 48, 32 Am. St. Rep.
113, 29 N. E. 854.

Due process of law requires a hearing and full trial upon the mer-
its. Greensboro v. Ehrenreich, 80 Ala. 579, 60 Am. Rep. 130;
Kosciusco v. Slomberg, 68 Miss. 469, 12 L.R.A. 528, 9 So. 297.

*William Langer,* Attorney General, and *Edward B. Cox* and
*George F. Shafer,* Assistant Attorneys General, for respondent.

Due process, as guaranteed by the Federal and state Constitutions
and as interpreted by the courts in instances of this kind, is accorded
the appellant by the laws and procedure provided in the Code. Comp.
Laws 1913, §§ 2686, 2687.

That which is "due process" is necessarily dependent upon different
circumstances. Sometimes summary proceedings are sufficient to
meet all its requirements. The summary abatement of nuisances
without judicial proceedings was well known to the common law prior
to the adoption of the Constitution, and the provisions of the 14th
Amendment were not intended to prevent such action. Such actions

are in the nature of a protection to the health, morals, and safety of the community. It is not necessary, in such cases, that the state make compensation. Lawton v. Steele, 152 U. S. 133; New Orleans v. N. Charouleau, 18 L.R.A.(N.S.) 368, 46 So. 911.

Defendant was not entitled to a judicial hearing before his property was condemned. If a nuisance existed, it was within the power of the board to abate it, in the manner prescribed by law. Houston v. State, 98 Wis. 481, 42 L.R.A. 39, 74 N. W. 111; Bittenhaus v. Johnston, 92 Wis. 596, 32 L.R.A. 380; Mugler v. Kansas, 123 U. S. 623; Kidd v. Pearson, 128 U. S. 1.

"The constitutional provisions declaring that property shall not be taken without due process of law have no application to statutes enacted in the exercise of the police power." Comp. Laws 1913, § 2687; Deems v. Baltimore, 80 Md. 164, 26 L.R.A. 541; People v. Vandecarr, 175 N. Y. 440, 67 N. E. 913, affirmed in 199 U. S. 352; State ex rel. Dakota Trust Co. v. Stutsman, 24 N. D. 80, 6 Dak. 501; 3 C. J. 51 and note 87; 6 R. C. L. 174, 175, 448, 454.

In taking lawful steps to prevent the spreading of an infectious or contagious disease, among live stock, the Sanitary Board exercises its own discretion, and the courts have no voice in or control over such matter. Courts cannot substitute their judgment for that of such board unless it be made to clearly appear that the board arbitrarily exceeded its authority or abused its discretion. State ex rel. Dak. Trust Co. v. Stutsman, 24 N. D. 80; Shipman v. Live Stock Sanitary Commission (Mich.) 73 N. W. 817; Maynard v. Freeman, 27 L.R.A.(N.S.) 1188 and note (Tex.) 60 S. W. 334; Lewis v. Shelby Co. (Tenn.) 43 L.R.A.(N.S.) 1076 and note; 22 Cyc. 404, 405, 23 L.R.A. 1188 and note.

The courts recognize the validity of statutes empowering boards of health and other governmental agencies to make use of scientific methods or tests in determining the presence of dangerous and infectious diseases, when such methods or tests have disclosed the fact that the disease was present in an animal, even though the symptoms thereof were not otherwise determined or open and apparent to the naked eye. Adams v. Milwaukee (Wis.) 129 N. W. 518; 43 L.R.A.(N.S.) 1067 and note; State v. Nelson, 34 L.R.A. 318, 68 N. W. 1066; New Orleans v. Charouleau, 18 L.R.A.(N.S.) 368, 46 So. 911.

BRUCE, Ch. J. This is an appeal from an order dissolving a temporary restraining order, and from a judgment dismissing the action. The plaintiff sought to permanently restrain the State Live Stock Sanitary Board from destroying a certain mare, which the said board had determined to be "infected with a dangerous, contagious, and infectious disease known as dourine."

The statutes [Comp. Laws 1913] under which the board acted are as follows:

"Section 2678: A board is hereby established to be known as the 'State Live Stock Sanitary Board.' This board shall consist of five members to be appointed by the governor. . . . Each member of said board shall be a qualified elector of the state of North Dakota. Three members of said board shall be persons who are financially interested in the breeding and maintenance of live stock in the state of North Dakota and the other two members of said board shall be competent veterinarians who are graduates of some regularly organized and recognized veterinary college or university."

"Section 2686. Authority is hereby given to said State Live Stock Sanitary Board to take all steps it may deem necessary to control, suppress and eradicate any and all contagious and infectious diseases among any of the domestic animals of the state, and to that end said board is hereby empowered to quarantine any domestic animal which is infected with any such disease or which has been exposed to infection therefrom, and to kill any animal so infected; to regulate or prohibit the arrival in or departure from the state, or any portion of the state, of any such exposed or infected animal, and at the cost of the owner thereof to detain any domestic animal found in violation of any such regulation or prohibition."

"Section 2687. Whenever a domestic animal has been adjudged to be affected with a contagious or infectious disease and has been ordered killed by said State Live Stock Sanitary Board or by an accredited agent thereof, the owner or keeper of said animal shall be notified thereof, and within twenty-four hours thereafter its owner or keeper may file a protest against the killing thereof with said board or its accredited agent who has ordered such animal killed. Such notice shall state under oath that to the best of the knowledge and belief of the person making such protest, such animal is not infected

with any contagious or infectious disease; whereupon an examination of the animal involved shall be made by three experts, one of said experts to be appointed by said State Live Stock Sanitary Board, one to be appointed by the person making such protest and the two thus appointed to choose a third, but all experts shall be persons learned in veterinary medicine and surgery and graduates of a regularly organized and recognized veterinary college."

"Section 2688. In case all three experts or any two of them declare that such animal is free from any contagious or infectious disease, then the expense of the consultation shall be paid by the State Live Stock Sanitary Board out of the funds appropriated for the carrying into effect of this act [§ 2696], and in case the three experts or any two of them declare the animal to be affected with a contagious or infectious disease then the expenses incurred in the consultation shall be paid by the person making the protest, and said expenses may be collected the same as in case of appeal in civil action."

The board also acted under the following rules and regulations which had been regularly adopted by it.

"The State Live Stock Sanitary Board having determined that dourine existing in horses in this state can only be eradicated by adopting rigid measures, therefore by authority granted in §§ 2 and 9 of chapter 169, Sess. Laws 1907, the following regulations for the eradication of dourine are hereby established.

"Section 1. Any owner or person in charge of any mares, stallions, or jackasses, shall when ordered by an unauthorized agent of the Live Stock Sanitary Board, round up or gather and submit said animals to such inspection as the agent of the Live Stock Sanitary Board shall direct, or be subjected to arrest, as provided for in § 15, chapter 169, Sess. Laws 1907.

"Section 2. Whenever it has been determined by the application of the complement fixation test that any mare, stallion, jack or gelding is infected with dourine said infected animal shall be appraised by the agent of the Live Stock Sanitary Board as hereinafter provided, and said animal shall be immediately destroyed.

"Section 3. The value of any stallion, jack, mare or gelding, infected with dourine shall be determined by the actual market selling price, and the appraisement made accordingly.

"Section 4. Owners will be indemnified for animals destroyed on account of being infected with dourine as hereinafter provided.

"Section 5. The United States Department of Agriculture will pay one half the indemnity on mares, grade stallions, jacks and geldings destroyed for dourine, and the state will assume the payment of one half the indemnity subject to an appropriation being created by the next legislature to provide for said indemnity provided in no instance shall the full indemnity to be paid on said animals exceed $100. Provided in the instance of pure bred registered stallions and mares as determined by pedigree of registration in a recognized horse registry association, the maximum indemnity shall be $150. The state shall assume the payment of one half of said maximum indemnity as hereinbefore provided and the United States Department of Agriculture will pay the balance."

The trial court found the following facts:

1. Plaintiff is the owner of a certain mare which the defendant board has ordered destroyed on account of being infected, as the defendant board claims, with dourine.

2. The defendants acted and are acting pursuant to rules adopted by the State Live Stock Board, which provide that animals infected with dourine shall be destroyed.

3. In the administration of the law, the defendant board has elected that its agents shall base their diagnosis, as to dourine, upon the complement fixation test, that is to say, even if an animal exhibits symptoms of dourine they do not destroy it unless it reacts positively to this test. On the other hand, if it has no symptoms of dourine at all they, nevertheless, order it destroyed if it shows a positive reaction to this test.

4. The defendant board and its agents have in all things acted in strict compliance with rules regularly adopted by the State Live Stock Sanitary Board.

5. Dourine is an infectious disease caused by a miscrosopic germ which exists in the blood of the diseased animals.

6. The complement fixation test is a blood test conducted by sending blood from the animal to be tested, to the Bureau of Animal Industry of the Department of Agriculture at Washington, where the test is performed by a man in the employ of the United States govern-

ment. It is not a bacteriological test, but is a chemical test. That is to say, the experts do not examine the blood under a microscope to discover the germ which causes dourine, which is very difficult to find, but subject it to a chemical test which is extremely technical, so technical that it is impossible for a layman to understand it and the ordinary veterinarian makes no pretense of understanding it. It was not shown to have been performed by more than one man in the United States.

7. The blood is taken from the animal to be tested, and prepared by the field veterinarians before it is sent to Washington. If the Bureau at Washington reports a positive reaction, the animal is ordered killed.

8. The disease of dourine has been known to the veterinary profession for many years, but the Complement Fixation Test is a new device which has not been used in the United States until the present campaign of eradication was begun in 1914 and 1915. It is also used in Canada.

9. The animals thus slaughtered frequently show no symptoms of the disease either while alive or upon post mortem examination.

10. Dourine is primarily a disease of the genital organs. It is not extremely contagious, being communicated only by actual contact and only through the act of breeding. Even breeding does not always result in communicating the disease. It is not hereditary.

11. After being infected, an animal usually develops symptoms of the disease in from three weeks to six months, the disease usually terminating fatally in from six months to two years. The disease is incurable.

12. The symptoms, when they develop, are to the physician plainly discernible to the naked eye. There are eruptions and ulcerations of the affected membranes, followed, as the disease progresses, by a constitutional breakdown, the animal becoming emaciated and the hind legs paralyzed, this condition being followed by death.

13. The mare in question is a valuable work animal worth about $250. So far as can be discerned by an examination by a veterinary surgeon, she is entirely sound and free from disease. This has been her condition at all times since she was ordered destroyed in the spring or summer of 1915. The blood test was made in the spring or

summer of 1915, at which time the Bureau at Washington reported a positive reaction. She has not been bred since the spring of 1915, and, so far as can be learned, she has never been bred to a diseased stallion. She, nevertheless, was apparently entirely sound in the winter of 1917.

14. The plaintiff did not avail himself of the statute providing for examination by a board of three experts.

15. The owner is a farmer and is keeping the mare under farm conditions, where he has complete control of her, and not permitting her to run with other horses, as would be the case under range conditions.

16. Former outbreaks of the disease in other parts of the United States have been readily stamped out under farm conditions without the slaughtering of animals not showing clinical symptoms of the disease.

17. In the opinion of the trial court, in view of the apparent healthfulness of the mare so long after the test was made, and in view of the fact that symptoms ordinarily develop soon after infection, it is very doubtful whether the mare in question is infected with dourine or ever has been, and the court therefore neither finds that the mare is or is not infected with dourine.

18. The plaintiff offers to observe quarantine regulations if imposed, and agrees to furnish a satisfactory bond conditioned that the mare in question shall not be bred.

19. In the opinion of the trial court, the public can effectively be protected by suitable quarantine regulations, and the court therefore finds that, until the mare in question develops clinical symptoms of dourine, it is not necessary, for the protection of the public, that she be slaughtered, and her slaughter would therefore constitute an unnecessary and unwarranted invasion of plaintiff's property rights.

In spite of the finding, however, that in his opinion the public could be effectively protected by suitable quarantine regulations, and that the mare in question had shown no clinical symptoms of the disease, the learned trial judge dissolved the injunction on the grounds that:

"1. The legislature has invested the State Live Stock Sanitary Board with full power to determine what infectious diseases are such

as to require that animals affected with such disease shall be destroyed in order to protect the public.

"2. The legislature has invested the State Live Stock Sanitary Board with full power to determine what test shall be applied in determining whether a particular animal is infected with an infectious disease."

"3. The courts have no power to interfere with the discretion which the legislature has conferred upon the State Live Stock Sanitary Board."

He also held that the only provision for a review of the board's determination is to be found in § 2687 of the Compiled Laws of 1913, which provides for a protest and an examination by three experts, and that since plaintiff had not demanded such a review he was controlled by the determination of the board, and could not afterwards dispute it.

The plaintiff, on the other hand, contends that, since the mares are now, from all appearances, in a healthy and sound condition, and the disease can only be communicated by breeding, to permit their destruction would be taking property without due process of law, and in conflict with the 14th Amendment to the Constitution of the United States, and also in conflict with the following provisions of article 1 of the Declaration of Rights:

Sec. 14, art. 1 of Declaration of Rights: "Private property shall not be taken or damaged for public use without just compensation having first been made to or paid into court."

Sec. 22, art. 1: "All courts shall be open, and every man for any injury done him in his lands, goods, person, or reputation shall have remedy by due process of law and right, etc."

On the first proposition he contends that §§ 2687 and 2688, which provide for an appeal to a board of experts, do not establish a tribunal the proceedings of which can be classed as due process of law. He contends that the three experts provided for are not elective officers nor are they appointive officers provided for by the Constitution. One of them, he states, is chosen by the two already selected. He cites Ruling Case Law to the effect that "the general rule that due process of law implies a hearing before condemnation or the reaching of a judgment through what is ordinarily understood to be judicial process,

is subject to an exception only in extreme cases or emergencies, as when the preservation and repose of society or the protection of the property rights of a large class of the community absolutely require a departure from the usual course of procedure." See 6 R. C. L. 457.

We think there is no merit in either of counsel's contentions. We have no particular fault to find with his statement of general legal principles, unless the word "absolute" is too comprehensive. The question, however, is whether or not the rights of the community reasonably require a departure from the usual course of procedure, and who is to be the judge as to the necessity of that departure. The question also may be considered, though the matter would not strictly be involved if the failure to appeal to the board of experts is controlling, whether the adoption of the so-called Complement Fixation Test was a purely arbitrary and unreasonable procedure on the part of the board so that such test cannot be made conclusive and generally applicable.

What is, and what is not, due process, depends upon the circumstances; and the constitutional provisions which provide for a preliminary court procedure are often held to have no application to statutes which are passed in the exercise of the so-called police power of the state. Sometimes summary proceedings are necessary, and the summary abatement of nuisances without judicial procedure was well known to the common law prior to the adoption of the state and Federal Constitutions. It has been repeatedly stated and held that neither the 5th nor 14th Amendments to the Federal Constitution, nor their counterparts in the constitutions of the several states, gave any new rights, but that they merely guaranteed the permanence of those already existing. It cannot, therefore, be supposed that the provisions referred to were intended to prevent the summary destruction of property which was a nuisance or liable to become a nuisance.

The case is not one of taking property for a public use, but of destroying a nuisance or of preventing one from using his personal and property rights in a manner injurious to the public welfare.

There is no property right in that which is a nuisance, and there is no right of liberty in that which is harmful to the public weal.

Neither the 14th Amendment to the Federal Constitution nor any provision of the Constitution of North Dakota "was designed to interfere with the power of the state, sometimes termed its police power, to

prescribe regulations to promote the health, peace, morals, education, and good order of the people, and to legislate so as to increase the industries of the state, develop its resources, and add to its wealth and prosperity." Barbier v. Connolly, 113 U. S. 31, 28 L. ed. 924, 5 Sup. Ct. Rep. 357; Mugler v. Kansas, 123 U. S. 623, 31 L. ed. 205, 8 Sup. Ct. Rep. 273; Bittenhaus v. Johnston, 92 Wis. 596, 32 L.R.A. 380, 66 N. W. 805; Kidd v. Pearson, 128 U. S. 1, 32 L. ed. 346, 2 Inters. Com. Rep. 232, 9 Sup. Ct. Rep. 6.

It is everywhere conceded that the state may interfere with private industry wherever the public welfare demands, and that in this particular a large discretion is necessarily vested in the legislature to determine not only what the interests of the public require, but what measures are necessary for the protection of these interests. Lawton v. Steele, 152 U. S. 133, 136, 38 L. ed. 385, 388, 14 Sup. Ct. Rep. 499; Bittenhaus v. Johnston, 92 Wis. 596, 32 L.R.A. 380, 66 N. W. 805; State ex rel. Gaulke v. Turner, 37 N. D. 635, 164 N. W. 924.

There can be no question that the disease of dourine is one which needs to be guarded against. At any rate, there can be no question that the legislative provisions in relation thereto were adopted for the purpose of protecting and promoting the industries of the state.

Nor can there be any question that the legislature had the power to delegate to the Live Stock Sanitary Board the power to adopt reasonable regulations and to adopt what tests it deemed necessary. This is not a delegation of legislative power. It merely commits "to a body of learned and scientific experts the duty of preparing such rules and prescribing such tests as may from time to time in the enforcement of the law be found necessary. . . . It merely relates to a procedure in the law's execution." Thornton, Pure Food & Drugs, § 13; Isenhour v. State, 157 Ind. 517, 87 Am. St. Rep. 228, 62 N. E. 40; State ex rel. Gaulke v. Turner, supra.

Nor was there a denial of due process of law. Due process of law, as we have before pointed out, does not everywhere involve a trial by jury nor in a regularly established court. There was an opportunity to be heard before the Sanitary Board and before the board of experts provided for by §§ 2687 and 2688.

"While under ordinary circumstances the constitutional guaranty as to due process of law implies a formal judicial proceeding, it is

nevertheless well settled that this does not invariably require such a proceeding, and accordingly questions may arise which may be best determined otherwise than by ordinary process of judicial investigation without violating the constitutional provision as to due process of law." 6 R. C. L. § 454; Deems v. Baltimore, 80 Md. 164, 26 L.R.A. 541, 45 Am. St. Rep. 339, 30 Atl. 648; People ex rel. Lieberman v. Vandecarr, 175 N. Y. 440, 108 Am. St. Rep. 781, 67 N. E. 913, affirmed in 199 U. S. 552, 50 L. ed. 305, 26 Sup. Ct. Rep. 144; State ex rel. Dakota Trust Co. v. Stutsman, 24 N. D. 80, 139 N. W. 83, Ann. Cas. 1914D, 776.

It would be absurd, too, to contend that this power was vested in persons ignorant or uninterested in the stock raising industry. The statute expressly provides that three members of the Sanitary Board shall be persons who are financially interested in the breeding and maintenance of live stock, and that the other two shall be competent veterinarians; and as far as the board of experts is concerned, the statute also provides that they "shall be persons learned in veterinary, medicine, and surgery," one of whom "shall be appointed by petitioner, one by the Sanitary Board, and the other shall be elected by the two already chosen."

We realize that it seems to be generally held by the courts that the question whether the property sought to be destroyed is infected with the disease, and therefore comes within the provision of the law providing for its destruction, is ultimately a question of fact, and that due process of law requires the ultimate submission of this question of fact to a jury. See 1 R. C. L. 1159; note in 26 L.R.A. 638; Miller v. Horton, 152 Mass. 540, 10 L.R.A. 116, 23 Am. St. Rep. 850, 26 N. E. 100; Newark & S. O. Horse Car R. Co. v. Hunt, 50 N. J. L. 308, 12 Atl. 697; Parker & W. Public Health & Safety, § 167, p. 183; Hutton v. Camden, 39 N. J. L. 122, 23 Am. Rep. 103; note in 43 L.R.A. (N.S.) p. 1076.

All that the Constitutions provide, however, is that no person shall be deprived of life, liberty, or property without due process of law, and that no property shall be taken for a public use without compensation. It is clear that, if the property is in fact a nuisance, it is not taken for a public use and to that extent it is not property at all. It is also clear that in the case of contagious diseases, which may be dis-

astrous in their consequences if not summarily rooted out, due process of law is afforded, if there is an ultimate appeal to the courts on the question of damages and if the property, in fact, is not a nuisance. There is a wide difference, however, between the right to summarily destroy and the right to destroy without liability to damages in case the property does not come within the prohibition of the statute. There is a wide distinction between a suit for an injunction to restrain the destruction of an animal for being diseased, and a suit for damages; and, even if the defendants are entitled to a jury or other trial before their right to damages can be taken away, it must certainly be the law that they must first take the steps necessary thereto, and must in the case at bar have submitted the controversy to the board of experts, which was provided by law.

Much more must this be the case where an injunction is sought to prevent the destruction. The legislature evidently realized that, in the case of dourine, summary action was often necessary. This was evidenced by the fact that they not only gave to the board the power to destroy, but gave a limited time in which an appeal could be taken to the board of experts. There can be no question of the power of the legislature to pass such statutes and to summarily order the destruction of nuisances, in the discretion of the Sanitary Board after a hearing and an appeal to the board of experts, if demanded, and though leaving to the owner the right to damages and to a resort to the courts for relief, if in fact the property is not a nuisance and its destruction is not necessary, to leave this as his only method of relief and to condition it on first appearing before the board of experts.

Any other rule would render all health and sanitary laws absolutely inoperative, and leave all boards of health powerless to prevent the spread of contagious diseases.

In the case of New Orleans v. Charouleau, 121 La. 890, 18 L.R.A. (N.S.) 368, 126 Am. St. Rep. 332, 46 So. 911, 15 Ann. Cas. 46, the court said: "Defendant next argues that he must be afforded a judicial hearing before his property can be condemned. Here, again, the question is more one of fact than of law. Would it be practical in a large city to institute a judicial inquiry in the case of every diseased cow in every dairy? Impure food, decayed fish, meats, and vegetables, are subjected to the doom of the inspector, without appeal. We see no

reason why, in a large city, the same should not be done with dairy cows which, by a test recognized to be practically infallible, are found to be a serious menace to the public health."

In the case of United States v. Ju Toy, 198 U. S. 258, 49 L. ed. 1042, 25 Sup. Ct. Rep. 644, the court held that "due process of law is not infringed by the provision of the Act of August 18, 1894 (28 Stat. at L. 372, 390, chap. 301, Comp. Stat. § 4325), § 1, making the decision of the appropriate department on the right of a person of Chinese descent to enter the United States conclusive on the Federal courts in habeas corpus proceedings in the absence of any abuse of authority, even where citizenship is the ground on which the right of entry is claimed." In § 167 of Parker & Worthington on Public Health and Safety, we also find the following: "The finding or adjudication of any municipal authorities or local board of health will be no protection, if made *ex parte,* without notice to the party charged with the nuisance, and opportunity afforded him to be heard; and if the statute attempts to make such finding or adjudication final and conclusive against the party, it will be unconstitutional, unless it has secured to him such right of appeal, or such right to a hearing before judgment passes against him, or such right to a revision of the findings by a jury in the ordinary judicial tribunals, as will constitute what is recognized as 'due process of law.' But it can never be necessary to construe the statute in a way that will render it unconstitutional for denying the right to a hearing or to a trial by jury; if it authorizes summary proceedings, without notice, against the thing declared to be a nuisance, the hearing and the trial, upon all the facts, may be had in an action subsequently brought by the owner for alleged trespass."

The rule, if rule it be, that members of a sanitary board or board of health are liable in damages if they destroy that which in fact is not a nuisance or that which in fact does not come within the terms of the statute, is exceedingly drastic, and if pushed to its limit would result in making such boards neglectful of their duty for fear of monetary consequences. Having such a possible responsibility and being subject to such a possible liability, a statute surely is not unreasonable or unconstitutional which provides in all cases for a speedy submission to a board of experts, so that the members of the Live Stock

Sanitary Board may have the speedy means of determining the facts in the case, and may know if they may safely proceed. It surely affords an opportunity to the owner of the stock to be heard, and the contention of my brother Robinson that such a hearing would be useless as the members of the board of experts, would be corrupt; and that there is only one person in Washington who is acquainted with the Complement Fixation Test is, of course, not merely unjudicial, but absurd. The only finding in the case by the trial judge is that it was not shown that anyone but the chemist in Washington was capable of making the test. We know, however, that it is a test which is generally used in Canada, and we do know that there are tens of thousands of capable chemists in the United States. The board of experts also could apply any test they chose, and were not even controlled by the Complement Fixation Test, which had been adopted merely by the board. They could have sent samples of the blood not merely to Washington, but to Canada, and to chemists throughout the United States. The fact that only a few men are in the business of making such tests does not in any way prove that there are not thousands of chemists who could make it. As we said before, the experts were not even bound by that test.

The statute which provides for the board of experts is surely a reasonable one. It furnishes a preliminary procedure for the protection of both parties, and surely no right of recovery should exist where the defendant choses not to resort to this remedy. The statute, indeed, is not different from those which require notice to a municipality before a suit of damages may be brought, or notice to a railroad company in the case of injury to stock which has been transported, so that a proper investigation may be had. These statutes have been everywhere upheld.

As far, too, as the efficacy of the Complement Fixation Test is concerned, we do not feel that this court has any right to interfere with the determination of the board. This determination was clearly not arbitrary. It is the test now generally recognized by the scientific world, and both in Canada and the United States; and, with our limited knowledge, we are not prepared to controvert the findings and conclusions of the scientific world. See "Diagnosis of Dourine by Complement Fixation," by John R. Mohler, Adolph Ericborn, and John

M. Buck of the Pathological Division of the United States Bureau of Animal Industry, vol. 1, No. 2, Journal of Agriculture Research; Report of the Veterinary Director General of Canada for year ending March 31, 1914.

It may also be noticed that the finding of the trial court, though expressing the opinion that the slaughter of the horses was unnecessary and that quarantine would furnish a sufficient protection to the public, nowhere held that the horses were not, in fact, diseased. Whether destruction as opposed to quarantine was the proper remedy was, however, and subject to an appeal to the board of experts, left by the legislature to the Live Stock Sanitary Board to determine. Neither the trial court nor this court has any right to interfere with that discretion. As far, too, as the existence of the disease is concerned, it is well established that where one fails to appear before such a board, the judgment of the board will be conclusive upon it. It is also as equally clear that where an appeal to a board of experts is provided and he refuses to take it, he waives the appeal and the right to question the judgment of the first board. Parker & W. Public Health & Safety, § 174.

Generally speaking, and in all of such matters, the only question in which the courts or the juries are concerned is the ultimate question whether the animal was diseased or not; that is to say, whether the board acted outside of its jurisdiction or outside of the statute. There are no such findings. We have no satisfactory proof that such is the case, and the board of experts has not been appealed to. The finding of the board, therefore, must be conclusive upon us. Parker & W. Public Health & Safety, § 168; Metropolitan Bd. of Health v. Heister, 37 N. Y. 661; Van Wormer v. Albany, 15 Wend. 262; 18 Wend. 169; Reynolds v. Schultz, 34 How. Pr. 147, 156.

In the case of State v. Nelson, 66 Minn. 166, 34 L.R.A. 318, 61 Am. St. Rep. 399, 68 N. W. 1066, in upholding an ordinance requiring a license to sell milk within the city, and fixing as a condition precedent to obtaining a license that the cattle from which milk is obtained must be inspected by the city veterinarian, and providing that, "for the purpose of detecting . . . tuberculosis or any other contagious or infectious disease . . . the said veterinarian . . . in making such inspection, is hereby authorized to use what is known

as the 'tuberculin test' as a diagnostic agency for the detection of tuberculosis in such animal," the court said: "The objection is urged that the ordinance is oppressive and unreasonable in that it requires every dairy herd whose milk is desired to be sold within the city to be subjected to the 'tuberculin test,' which it is claimed is uncertain in its results and deleterious to the health of the animals. At the present stage of scientific research on this subject, it may be a debatable question whether this test has been fully proven, or how far it is as yet merely experimental. There is ample evidence in this case that it is now the generally accepted theory that the presence of consumption or tuberculosis in animals can be detected by this test, also that this is what is called a 'germ disease,' which may be contracted by eating the flesh or drinking the milk of a tuberculous animal. Upon the evidence we could not say that this provision of the ordinance is oppressive or that it has not a reasonable tendency to prevent the sale of unwholesome milk within the city."

Nor do we feel authorized to interfere with the discretion of the board in requiring all horses which react to the chemical Complement Fixation Test to be destroyed even though they exhibit no physical symptoms of the disease. In the first place an appeal to a board of experts was provided by the statute, and no appeal was taken; in the second, the opinion of the scientific world appears to be that such a course is necessary, and the statute expressly gives to the board the power "to take all steps it may deem necessary to control, suppress, and eradicate any and all contagious and infectious diseases among any of the domestic animals of the state, and to that end said board is hereby empowered to quarantine any domestic animal which is infected with any such disease, or which has been exposed to infection therefrom, and *to kill any animal so infected.*"

This statute clearly left it to the discretion of the board subject to appeal to the board of experts on the question of the existence of the disease, to determine whether the animals should be killed or quarantined, and that killing was contemplated in the case of dourine is also clearly evidenced by the appropriations made by chapter 29 of the Laws of 1915 for the "glandered horse and dourine fund," and by §§ 2, 3, and 5 of chapter 164 of the Laws of 1915, which provide that:

2. "All moneys now in or hereafter deposited in the glandered horse

fund shall be placed in the glanders and dourine horse fund and shall be preserved inviolate for the payment of claims for indemnity allowed for animals destroyed for either glanders or dourine.

3. "Whenever the State Live Stock Sanitary Board, or its authorized agent shall deem the slaughter of a stallion, gelding, mare or jackass necessary for being infected with dourine, the value of such animals shall be determined by the actual market selling-price and the appraisement made accordingly by an agent of the State Live Stock Sanitary Board. Provided, that the maximum appraisement for any grade stallion, gelding, mare or jackass shall be one hundred ($100) dollars, and the maximum appraisement for any purebred registered stallion, mare or jackass shall be one hundred fifty ($150) dollars. Provided, that the indemnity paid by the state shall be a sum equal to the indemnity paid in each case by the Federal government."

5. "When the animal or animals at the time of their destruction have been in the state less than six months."

Nor is there any merit in the contention that horses so infected may be quarantined or isolated and a bond given that they shall not be used in breeding; and that, since breeding is the only means of communicating the disease, the destruction of the animal is unnecessary. This method would leave the prevention of the spread of the disease largely to the care and honesty of the owners, and the straying and misuse of the horses and their sale or exchange to others, who were ignorant of their condition or careless and dishonest, could only be prevented by the employment of a large force of inspectors.

The disease, indeed, spreads so rapidly and is so disastrous in its consequences that the experience of the past has shown that the most drastic measures must be taken.

The judgment of the District Court is affirmed.

CHRISTIANSON, J. (concurring specially). In 1884 Congress created the Bureau of Animal Industry. 23 Stat. at L. 31, chap. 60, Comp. Stat. § 850, 1 Fed. Stat. Anno. 2d ed. p. 406. "Three distinct subjects are embraced by that act. One is the ascertainment through the Agricultural Department of the condition of the domestic animals of the United States, the causes of contagious, infectious or communicable diseases affecting them, the best methods for treating, transport-

ing and caring for animals, *the means to be adopted for the suppression and extirpation of such diseases,* . . . and to collect such information on those subjects as will be valuable to the agricultural and commercial interests of the country." Reid v. Colorado, 187 U. S. 137, 47 L. ed. 108, 23 Sup. Ct. Rep. 92, 12 Am. Crim. Rep. 506. The act made it the duty of the Commissioner of Agriculture (this was subsequently made to apply to the Secretary of Agriculture) to prepare such rules and regulations as he might "deem necessary for the speedy and effectual suppression and extirpation of said diseases, and to certify such rules and regulations to the executive authority of each state and territory, and invite said authorities to co-operate in the execution and enforcement of the act." The act further authorized the Commissioner of Agriculture, on the acceptance of his plans and methods for the suppression and extirpation of such contagious, infectious, or communicable diseases by any state or territory wherein any such disease was declared to exist, or on the acceptance by him of plans adopted by any such state or territory, to expend so much of the moneys appropriated by the act as might be necessary to prevent the spread of the disease from one state or territory into another. Congress has consistently adhered to the legislative policy announced in and put into effect by the act referred to. And during the course of time it has recognized the importance of the work performed by the Bureau of Animal Industry. In 1902 Congress authorized the Secretary of the Interior to establish a laboratory for the Bureau of Animal Industry, and appropriated the necessary moneys for the purpose. See Agricultural Appropriations, June 3, 1902, chap. 985, 32 Stat. at L. 290.

Following the example set by Congress, the different states and territories enacted legislation relating to the subject. The legislature of the territory of Dakota in 1887 enacted a law entitled "An Act to Suppress and Prevent the Spread of Contagious and Infectious Diseases in Animals." Laws 1887, chap. 32. The act authorized the appointment by the governor of an officer to be known as the "veterinary surgeon," and made it the duty of such state veterinary surgeon to investigate any and all cases of contagious or infectious diseases, among the animals of the territory, of which he had knowledge or which was brought to his attention; to establish quarantine of infected

premises, and in case of epidemic diseases to order the slaughter of any and all diseased animals upon the premises and of all animals that had been exposed to contagion or infection.

This legislation was in force when our state Constitution was framed and adopted. Some of the members of the legislative body which enacted it were also members of the constitutional convention and of the first legislative assembly of the state, which legislative assembly enacted legislation quite similar to the territorial enactment. Laws 1890, chap. 185. And while the matter has been considered by many of the subsequent legislative assemblies, the main purpose announced in the original enactment has been constantly and consistently adhered to. In 1907 the North Dakota legislature created the Live Stock Sanitary Board and thereby abolished the former statutes relating to district veterinarians. The statutory provisions relative to the Live Stock Sanitary Board are fully set forth in the opinion written by Chief Justice Bruce. See Laws 1907, chap. 169.

I am not informed as to what time dourine became recognized by the Bureau of Animal Industry as a disease requiring suppression or extirpation. But by the rules and regulations adopted (to become operative April 15, 1907), the bureau specifically provided for the condemnation and destruction of all horses and asses affected with the disease, and offered a reward of $25 for authentic information leading to ownership and location of a female animal affected with the disease. (See Regulations Nos. 38 to 41 inc., B. A. I., Order No. 143, issued by the Secretary of Agriculture.) In Regulation 39 it is provided that if stallions or jacks are allowed to run at large in an area quarantined by the Secretary of Agriculture for dourine, or if there is any breeding of horses or asses in a herd in an area quarantined by the Secretary of Agriculture for dourine in which there is a horse or ass which has been exposed to the infection of dourine within eighteen months after said exposure, a rule will be issued forbidding absolutely the interstate movement of any horses or asses from said area. B. A. I. Order No. 210, issued by the Secretary of Agriculture on June 18, 1914, provides that "when it is necessary in order to prevent the spread of the disease and to aid in its extermination, and an appropriation is available therefor, the Department of Agriculture

will co-operate with the various states in the purchase of diseased animals in the following manner:

"(a) The fact of infection with this disease shall be determined by the Complement Fixation Test applied in the laboratory of the Bureau of Animal Industry.

"(b) The animal shall be appraised at its actual value by an inspector of the Bureau of Animal Industry and the state veterinarian or an assistant state veterinarian of the state in which the animal is located, or, when provided by state law, assessed value as shown by the assessor's books will be accepted in lieu of appraisal.

"(c) The department will pay one half the appraised or assessed value, provided such share shall in no case exceed $100 and the owner signs an agreement to accept such sum as compensation in full for the discharge of all claims he may have against the United States Department of Agriculture on account of the destruction of the animal in question." See § 3, Regulation 6, B. A. I. Order 210. These regulations speak for themselves.

The Complement Fixation Test has been utilized by the Bureau of Animal Industry and the defendant board in diagnosis of dourine for some years. It has also been adopted and utilized for some time by the Department of Agriculture of the Dominion of Canada. See Report of the Veterinary Director General of Canada for 1914. That this test is deemed the best, and in fact an infallible, method of diagnosis by these different boards and by veterinarians in general, is not denied. That the mare involved in this litigation was properly subjected to this test and found thereby to be affected with dourine is undisputed. That dourine is an incurable disease is conceded.

The authority of the legislature to enact laws for the protection of domestic animals, and to prevent the spread of infectious or contagious diseases among them, is everywhere recognized as a valid exercise of the police power of the state. 3 C. J. p. 50, § 145. It is well settled that under such police power the state may confer authority on designated officers or specially created commissions to destroy animals affected with contagious or infectious diseases (3 C. J. p. 54, § 151), and also confer upon such officers or commissions authority to execute the law and to adopt reasonable needful regulations to that end, 3 C. J. p. 51, § 147.

Whether the judgment of the officers or boards as to the diseased condition of a condemned animal is conclusive, is a question upon which the courts have differed. Some courts hold that such judgment is conclusive. 3 C. J. p. 54. Other courts have held that the *ex parte* decisions of such officers or boards for the destruction of an animal is not conclusive upon the question that the animal was diseased. Miller v. Horton, 152 Mass. 540, 10 L.R.A. 116, 23 Am. St. Rep. 850, 26 N. E. 100; Pearson v. Zehr, 138 Ill. 48, 32 Am. St. Rep. 113, 29 N. E. 854; Asbell v. Edwards, 63 Kan. 610, 66 Pac. 641; Crane v. State, 5 Okla. Crim. Rep. 560, 115 Pac. 622; Richter v. State, 16 Wyo. 437, 95 Pac. 51.

These latter cases are based upon the theory that, while the legislature has the power to declare domestic animals affected with certain contagious or infectious diseases to be nuisances and order their summary destruction, even without compensation, it has no power to declare all domestic animals, those free from disease as well as those diseased or exposed, to be nuisances and order their summary destruction without compensation to the owners. It is therefore concluded that inasmuch as the legislature cannot itself order the destruction of domestic animals unless they are actually affected with, or have been exposed to, a contagious or infectious disease so as to constitute an actual or potential menace to the health of other domestic animals or to human beings, it cannot authorize officers or commissions to do so; that the jurisdiction and power of such officers or boards to destroy is limited to animals of the latter class: and that when they order the destruction of animals free from, or not carriers of, disease, they exceed their powers and act outside of their jurisdiction.

The question referred to is one of great importance. But in my opinion it is not necessarily involved in this case, and I therefore express no opinion thereon. Neither do I express any opinion as to whether the members of the defendant board would be liable personally for damages resulting from an error of judgment on their part in condemning and destroying animals free from disease. For even though the findings of the board are not conclusive, they are nevertheless presumed to be correct and must be so accepted, unless it is shown that they are erroneous or fraudulent or collusive, or that the board acted outside, or in excess, of the power conferred upon it by the statute.

It is undisputed that the defendant board proceeded in all things in accordance with the rules and regulations established by it under the statute, and in accordance with the regulations and practices of the Bureau of Animal Industry. The findings that the mare is affected with dourine was based primarily upon the blood test—the Complement Fixation Test—made in the laboratory of the Bureau of Animal Industry at Washington. The test, as already stated, is the one adopted by that bureau and by a similar board in the Dominion of Canada for the diagnosis of dourine. The test is recognized by these governmental agencies and by veterinarians in general as the surest and most infallible method of diagnosis. It has not been shown in this case that the diagnosis was erroneous, or that the findings of the defendant board were incorrect. While it appears that the mare was in an apparently healthy condition and exhibited no clinical symptoms of the disease, this does not necessarily prove that she was free from dourine. Apparently, the disease may exist in an animal which has all appearance of being in perfect health. It would appear from the rules of the Bureau of Animal Industry hereinabove set forth, that an animal may be affected with the disease for a considerable length of time before any clinical symptoms appear. It is possible that in this case a quarantine regulation might have been established and the owner permitted to use the animal for some time. This was, however, primarily a question for the defendant board; and even conceding that power exists in the courts to review the findings and determinations of the board, both as to the diseased condition of animals ordered to be destroyed and the necessity for their destruction, clearly the board's determination should not be interfered with, unless shown to be erroneous or unreasonable. And in view of the conceded incurable and virulent character of the disease, and the necessity to destroy the animals affected therewith, as recognized by the Federal and Canadian authorities, I am not prepared to say that the order of the defendant board was so unreasonable or arbitrary as to justify judicial interference, even conceding that the courts have the power to review the findings and determinations of the board. On the contrary, the action of the defendant board seems to be in harmony with the regulations adopted and the practices established by the Federal Bureau of Ani-

mal Industry and the Canadian authorities in dealing with, and in attempting to extirpate and suppress, dourine.

ROBINSON, J. (dissenting). This case relates to the right and power of the Sanitary Board to kill two splendid work horses on a mere suspicion that the animals are affected with the disease of dourine. It also relates to the right and duty of the courts to protect personal property against needless destruction. To sustain the killing and deny the right of the courts to interfere, a long opinion has been written. It is said: "The courts cannot review the discretion of the Live Stock Sanitary Board in ordering the mares to be killed under the provisions of the statute." If that is true then the board may order the killing of every horse in the state, and the courts are powerless to restrain them. If the courts may not review the orders of a sanitary board in ordering a horse to be killed, then the board must have absolute power to order the killing of all the horses in the state.

It is said: "There is no property in that which is a nuisance." If that is true, still a party may not be deprived of his property by calling it a nuisance. The proof that it is a nuisance must be clear and satisfactory. It is said the board has adopted a test of dourine which is approved by scientific men in the United States and in Canada. But that is not true. The test adopted is new and it is not known to science. If it were known and approved by such scientific men as Professor Ladd it would not be necessary to doctor the blood of the animals and to send it to a bureau in Washington for a supposed chemical test known to only one man in the United States.

There is only a mere suspicion that the mares are affected with any disease and there is good reason to believe that the suspicion is ill founded. Indeed the chances are ten to one against the disease. The appeal record contains not a word of evidence. It presents only the findings and conclusions of the trial court. The court finds: Each mare is a valuable work horse and may be worth about $250. She is entirely free from disease so far as can be discerned by an examination of a veterinary surgeon. This has been her condition since she was ordered destroyed in the summer of 1915. So far as can be ascertained she has never been bred to a diseased stallion. Hence, the court finds that it is not necessary for the protection of the public that the

mares should be slaughtered, and that the slaughter would constitute an unnecessary and unwarranted invasion of plaintiff's property rights. The court finds that the board and its agents base their diagnosis of dourine on a blood test conducted by sending the blood from the animal to the Bureau of Animal Industry at Washington. The experts do not examine the blood under a miscroscope, but subject it to a chemical test which is so extremely technical that it is impossible for any layman to understand it, and the ordinary veterinarian makes no pretense to understand it. It was not shown to have been performed by more than one man in the United States."

"The blood is taken from the animal to be tested and prepared by the field veterinarian before it is sent to Washington. If the bureau at Washington reports a reaction, the animal is ordered killed. The test is a new device which was not used in the United States until 1914. Animals slaughtered frequently show no symptoms of the disease either while alive or on post mortem examination. It is a disease of the genital organs, and is communicated only by actual contact in the act of breeding. After infection an animal usually developed symptoms of the disease in from three weeks to six months, and the disease usually terminates fatally in from six months to two years."

Such are the findings. From the official reports of the board it appears that during the four years commencing with 1914, 31,406 horses were bled for the fixing test and there was a killing of 700 horses. Regardless of any protest every animal is killed on a mere report that its blood yields to the new fixing test. Of course, in such reports there are chances of error or mistake. Indeed, the chances are that most of the horses killed, showing no symptoms of disease, were perfectly sound and healthy. And surely it should not be necessary for a board of scientists to show its zeal or skill by bleeding 31,406 horses to kill 700. For all this there must be some motive besides pure patriotism. There must be some money in the business. The killing of animals has prevailed quite extensively, and, as I think, there is good reason to believe that many sound and healthy animals have been killed. The result is a great loss to those whose good animals are killed and loss to those who bear the expense and pay the taxes. And yet it profits the board and the agents who do the killing. In 1917, this amount was paid the board manager, his clerk, and agents $11,845.17; in 1916, $12,934;

and for animals killed there was paid $36,466. I wish it were so that every man in all the world had to live or die by his own honest toil.

Under the statute when an order is made for the killing of an animal within twenty-four hours, the owner may protest by making and serving an affidavit that he verily believes the animal is free from any disease. Then to determine the question the board or its agents appoint a veterinarian. The animal owner appoints one, and the two appoint a third, but the proceeding is a mere farce and a mockery. The board or its field agent secures a killing decree every time. That is shown by its own reports. It is shown that numerous protests have been made and that no killing has ever been prevented only by an injunction; and yet it is contended that such a hasty mock appeal to bleeders and killers does constitute due process of law, and that the courts are powerless to protect a person against the destruction of his sound and healthy animals. But the Constitution is that the courts shall be open, and that every man for any injury done him in his person or property shall have a remedy by due process of law, and right and justice administered without sale, denial, or delay. Now this due process of law means the law as administered by the courts in the regular course of judicial procedure. In a country of law every person has a right to an appeal to the courts, and, except in cases of the most imperative and manifest necessity, no man can be legally deprived of life or property except pursuant to the judgment of a court of competent jurisdiction.

In this case the trial judge has found that the animals are not a nuisance, and that to kill them would unjustly deprive the owner of his property. On the findings of fact it is clear that the court was taken in its conclusions of law, but that is no reason for this court to do likewise. On such facts and findings there is no justification, either in law or in morals, for the killing of two splendid work horses. The judgment should be reversed.

GRACE, J. I dissent from the result reached by my associates in the majority opinion of the court in this case.

## On Petition for Rehearing.

PER CURIAM: Plaintiff has filed a petition for rehearing. On such petition he presents two propositions:

(1) He first contends that the legislature may not, even in the exercise of the police power, authorize the destruction of any animal, even though infected with dourine, unless such destruction is essential to protect the health or promote the collective welfare of the public.

(2) He next contends that the mare involved in this action is not, in fact, infected with dourine, but is wholly free therefrom, and that the defendant board had no authority to order her destruction.

We will consider the proposition in the order stated.

(1) "The police power" is the power inherent in a government to enact laws, within constitutional limits, to promote the order, safety, health, morals, and general welfare of society. Such power, as pointed out by Mr. Justice Holmes, speaking for the Supreme Court of the United States, in Noble State Bank v. Haskell, 219 U. S. 104, 55 L. ed. 112, 32 L.R.A.(N.S.) 1062, 31 Sup. Ct. Rep. 186, Ann. Cas. 1912A, 487, may be said, in a general way, to extend to all the great public needs, and "it may be put forth in aid of what is sanctioned by usage, or held by the prevailing morality, or strong and preponderant opinion to be greatly and immediately necessary to the public welfare." As applied to the powers of one of the states of the Union, the term "police power" is also used to denote those inherent governmental powers which, under the system established by the Constitution of the United States, are reserved to the several states. 12 C. J. 905. Of course, there is no such thing as a police power which is above the Constitution, or which justifies any violation of express or manifestly implied constitutional prohibitions. State ex rel. Milwaukee Medical College v. Chittenden, 127 Wis. 468, 107 N. W. 500. And, "however broad the scope of the police power, it is always subject to the rule that the legislature may not exercise any power that is expressly or impliedly forbidden to it by the state Constitution." 12 C. J. 929. But where a subject is within the police power, it is for the legislature to say what the remedy shall be, and a police enactment will be upheld unless it contravenes some constitutional restriction. American Lin-

40 N. D.—24.

seed Oil Co. v. Wheaton, 25 S. D. 60, 41 L.R.A.(N.S.) 149, 125 N. W. 127.

That a state legislature may, in the exercise of the police power, provide for the quarantine of diseased or suspected animals and for the destruction of animals infected with contagious or infectious diseases, is no longer an open question. Legislative enactments making such provisions have been almost universally upheld. And in enacting such regulatory measures the legislature may require precautions within the whole range of possible danger. But the regulations adopted must have some reasonable or probable connection with the public object sought to be accomplished. In other words, the legislature itself cannot, nor can any board created by it, adopt such means or prescribe such methods as are clearly unreasonable and arbitrary. This is especially true where it is sought to destroy property, as such extreme measures are only justified within the limits of necessity. Herlihy v. Donohue, 52 Mont. 601, L.R.A.1917B, 702, 161 Pac. 164, 166, Ann. Cas. 1917C, 29, 14 N. C. C. A. 1022; Freund, Pol. Power, § 521. And it will be noted that the statute under consideration authorizes the destruction only of animals which are actually *infected* with a contagious or infectious disease. Hence, leaving constitutional considerations on one side, it is clear that under the statute the defendant board has no power or jurisdiction to order the destruction of animals which are free from such diseases. Asbell v. Edwards, 63 Kan. 610, 66 Pac. 641; Crane v. State, 5 Okla. Crim. Rep. 560, 115 Pac. 622; see also State v. Speyer, 67 Vt. 502, 29 L.R.A. 573, 48 Am. St. Rep. 832, 32 Atl. 476.

The legislature created the Live Stock Sanitary Board and conferred upon it authority "to take all steps it may deem necessary to control, suppress, and eradicate any and all contagious and infectious diseases among any of the domestic animals of the state; and to that end said board is hereby empowered to quarantine any domestic animal which is infected with any such disease, or which may have been exposed to infection therefrom *and to kill any animal so infected.*" Comp. Laws, § 2686.

Under the statute the defendant board adopted a rule providing for the destruction of all animals infected with dourine. In adopting such rule the defendant board merely put into operation the practice

established and followed by the Bureau of Animal Industry and by similar boards in the Dominion of Canada and several states of the Union. Upon the first proposition presented on the petition for rehearing a majority of this court are still of the opinion:

1. That the legislature, in order to suppress or eradicate contagious or infectious diseases among domestic animals, may provide for the destruction of infected animals in all cases where such destruction is reasonably necessary, and to that end had the power to create and confer upon the State Live Stock Sanitary Commission authority to execute the law and adopt such regulations as are reasonably necessary to accomplish the desired end.

2. That under our statute it is for the Live Stock Sanitary Board to determine whether it is necessary to kill an animal infected with dourine in order to suppress or eradicate the disease, or whether a quarantine of the infected animal or animals would be sufficient.

3. That the Live Stock Sanitary Board did not exceed its authority in adopting the regulation providing for the destruction of all animals infected with dourine.

(2) Upon the second proposition plaintiff has filed several affidavits with respect to the present condition of health of the mare involved in this litigation, accompanied by photographs of the mare. And it appears that though this litigation has continued for more than three years, the mare is still in apparent good health and has manifested no clinical symptoms of dourine. This condition is totally at variance with what the reports of the Bureau of Animal Industry and other literature on the subject of dourine would lead one to expect would have been true if the mare had actually been infected with dourine at the time of the commencement of this action. In fact, the showing made, while unusual and not altogether proper upon a petition for rehearing, is nevertheless such as to indicate a strong possibility, and almost a probability, that some error must have been made in the application of the Complement Fixation Test, or that the blood taken from the mare involved in this action might have become confused with that taken from some other animal. And this, of course, is not altogether impossible, or even improbable, when we consider the large number of specimens of blood taken and sent to Washington for examination. .

The efficiency of many police regulations depends upon their prompt and summary execution. Delay until a judicial determination could be had often would defeat the very purpose for which the regulation was enacted. In such cases it is indeed very proper for the courts to refuse to interfere with the carrying out of the order of the boards or officers intrusted with executing the law. The present action, however, has been pending for more than three years. The reason for the rule requiring judicial noninterference can hardly be said to exist. The parties to the litigation are here, and all the matters in controversy ought to be determined, if possible. This court should not send the parties out of court and compel either of them to come in by another door. Star Land Co. v. Olson, — Iowa, —, 168 N. W. 111. If the mare in question is, in fact, infected with the disease of dourine, it is within the power of the defendant board either to cause her to be destroyed or placed in quarantine, and their judgment upon this matter is not subject to review by the courts. But if the mare is not, in fact, infected with dourine, but is free from such contagious or infectious disease, the board has no power or jurisdiction to order the mare destroyed.

The evidence in the case was not transmitted to this court, and the district court expressly refrained from making any findings upon the question of whether the mare was, in fact, infected with dourine. Under all the circumstances, we do not feel justified in affirming the judgment unconditionally, as this might result in irreparable injury, but deem that the course most consonant with the principles of right and justice is to give the parties an opportunity to submit further evidence upon the question whether the mare is, in fact, infected with the disease of dourine. The case is, therefore, *remanded for a new trial in accordance with this opinion, and the trial court directed to take evidence and make findings, upon the question of whether the mare is, in fact, infected with the disease of dourine.*

In the foregoing per curiam denying the petition for rehearing all of the judges concur.

In that portion, however, remanding the cause with directions, Chief Justice Bruce and Judge Birdzell do not concur. While it is their opinion that it is proper under the state of facts presented to attempt to guard against a mistake passing beyond the bounds of remedy, they

feel that the remittitur should be held in this court for a period of sixty days to enable the Live Stock Sanitary Board to again apply the Complement Fixation Test and report the results thereof to this court. In their judgment this procedure, while unusual, would be more consistent with the main opinion than that which is ordered in this remittitur, and they see no reason to recede from the position taken in the original opinion.